IPSCO, INC. and IPSCO Steel, Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

and

Lone Star Steel Co., Defendant–Intervenor.

Court No. 86–07–00853.

United States Court of International Trade.

May 4, 1988.

Barnes, Richardson & Colburn, Rufus E. Jarman, Jr., Matthew J. Clark and Karin M. Burke, New York City, for plaintiffs.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Dewey, Ballantine, Bushby, Palmer & Wood, Michael H. Stein, Washington, D.C., for defendant-intervenor.

### OPINION AND ORDER

RESTANI, Judge:

Plaintiffs challenge the final affirmative countervailing duty determination of the United States Department of Commerce, International Trade Administration (ITA) in *Oil Country Tubular Goods from Canada,* 51 Fed.Reg. 15,037 (Apr. 22, 1986). Plaintiffs' challenges generally concern ITA's exclusion of other investigated firms from the determination of net subsidy rates, its choice of certain methodologies and incorporation of industry wide data in calculating the net subsidy, the validity and effect of the Subsidies Appendix, and whether certain subsidies are generally available.

### BACKGROUND

This action concerns certain steel products from Canada, known as oil country tubular goods (OCTG),[1] which were alleged to be receiving subsidies from the Canadian government and the Province of Saskatchewan. There are 11 known firms producing or exporting OCTG from Canada. ITA sent questionnaires to these firms, as well as to Canada and Saskatchewan. Timely requests for exclusion were received from all 11 companies. One of those firms, however, withdrew its request for exclusion and did not submit a response to ITA's questionnaire. ITA verified that eight of the responding firms received no benefits, and that a ninth, Algoma, a plaintiff-intervenor herein, was subsidized at the rate of 0.05 percent, which ITA found to be *de minimis.* These nine firms were excluded from ITA's countervailing duty determination and order. IPSCO, a plaintiff herein, and the other non-excluded firm were found to have received net countervailable subsidies at the rate of 0.72 percent, which was based on IPSCO's rates of subsidization. ITA directed Customs to collect cash deposits of 0.72 percent on all entries of Canadian OCTG, except for entries from the nine excluded firms.

### I. ITA'S EXCLUSION OF A MAJORITY OF THE INVESTIGATED FIRMS

Plaintiffs argue that ITA improperly excluded nine of the eleven Canadian OCTG

1. Oil country tubular goods are hollow steel products of circular cross-section intended for use in drilling for oil and gas. 51 Fed.Reg. at 15,038.

firms from its determination of net subsidization. Essentially, plaintiffs' position is that had ITA averaged IPSCO's net subsidy rate of 0.72 percent with firms receiving no subsidies, the resulting rate would have been *de minimis,* and consequently, ITA would have issued a negative determination of countervailing duties. They argue that ITA's failure to combine IPSCO's rate with the zero or *de minimis* rates of excluded firms amounts to error since: (1) the exclusion of firms leads to absurd results, manipulation and uncertainty; (2) Congress intended, and ITA has established a practice, that countervailing duty rates would apply on a country-wide, rather than company specific, basis; (3) ITA's regulations provide for excluding firms from countervailing duty "orders," not from countervailing duty "determinations;" and (4) the *de minimis* rate of 0.05 percent, attributed to an excluded firm, was not materially different from IPSCO's 0.72 percent rate.

### A. UNFAIR AND ABSURD RESULTS.

■ Plaintiffs argue that ITA's actions in this case were arbitrary, capricious, and have resulted in "a strange paradox." Plaintiffs' Brief at 18. Plaintiffs explain the paradox as follows:

> If the non-beneficiary and *de minimis* companies request exclusion (as they did) they are excluded for all purposes, and will never need to pay duties under the order. However, if they do not request exclusion, then there will be no order from which to be excluded. From their point of view, it makes no difference. Only the fate of IPSCO rides on whether its competitors do or don't request exclusion. This demonstrates the capricious nature of the ITA position in this regard.

*Id.*

The court finds nothing capricious about the outcome in this case. ITA determined that IPSCO applied for and received certain benefits from subsidy programs that are countervailable. Based upon the benefits IPSCO received from these countervailable programs, ITA determined a subsidy rate and ordered cash deposits to be posted upon IPSCO's entries of OCTG at that same rate.

The fact that other responding firms did not make use of these programs does not alter the essential nature of the programs, or the benefits they provide to IPSCO. At most, this fact could trigger a technical threshold that, under certain circumstances, would enable ITA to disregard the overall effect of the programs as insignificant. The court's sense of fairness is not offended, however, by the fact that this technical threshold has not been triggered in this case or by the fact that IPSCO will be required to post cash deposits on its entries of OCTG at a rate which offsets the actual rate of subsidization that the Canadian governments have bestowed upon them.

If ITA's policy of exclusion may give rise to paradoxical results, it has not done so in this case. The fact that ITA was presented with exclusion requests from all known firms, and that ITA was able to grant exclusions to each firm that demonstrated entitlement, instills confidence in the fairness and accuracy of ITA's ultimate determination. *See Fabricas El Carmen, S.A. v. United States,* 11 CIT ——, 672 F.Supp. 1465, 1478–79 (1987), *remand order vacated as moot,* 12 CIT ——, 680 F.Supp. 1577 (1988). For such firms to have failed to seek and obtain exclusion—risking a potential assessment of countervailing duties for no purpose other than to allow competitors receiving subsidies to compete in the U.S. market, without having the amount of those subsidies offset by U.S. countervailing duties—would have been more disturbing.[2]

### B. COUNTRY–WIDE VERSUS COMPANY SPECIFIC RATES.

■ Plaintiffs are not aided by the fact that ITA has a practice of favoring coun-

---

**2.** It is clear that the excluded firms understood that this option was open to them. Although they supported IPSCO's position in theory, they evidently placed a higher value on exclusion, even after the results of the preliminary deter-

mination were issued. At ITA's hearing, counsel for eight of the excluded firms stated that:

> We would just briefly like to express our agreement with IPSCO's interpretation of the

try-wide, over company specific countervailing duty rates, or that Congress has declared that countervailing duty orders "shall presumptively apply to all merchandise of such class or kind exported from the country investigated...." 19 U.S.C. § 1671e(2) (Supp. IV 1986).[3] As Congress noted in enacting § 1671e(a)(2), the purpose of the country-wide presumption is "to lessen the administrative burden on the administering authority stemming from implementing of company specific rates." H.Conf.Rep. No. 1156, 98th Cong., 2d Sess. 179–80 (1984), 1984 U.S.Code Cong. & Admin.News, pp. 4910, 5296–97. In any event, ITA has done nothing in this case which is inconsistent with either the statute, legislative intent, or ITA's own practice. Although ITA's net subsidy determination was, in fact, based upon the experience of the only responding Canadian OCTG producer that was not granted an exclusion from ITA's countervailing duty order, that rate was presumptively applied on a country-wide basis. ITA directed Customs to "require a cash deposit or bond for each such entry of this merchandise equal to 0.72 percent *ad valorem* except for OCTG from [the nine excluded companies]...." 51 Fed.Reg. at 15,045 (final determination). Accordingly, this rate would be applied to entries of OCTG from Canada, regardless of whether they were attributable to IPSCO, to the one known producer that did not respond to ITA's

questionnaire, or to any new, or presently unknown, producers or exporters of OCTG from Canada. Given the limited number of known producers and the fact that there was only one determinable non *de minimis* rate from which to choose, this was not an unreasonable way of establishing a country-wide rate.

## C. EXCLUSION OF FIRMS FROM "DETERMINATIONS" AS WELL AS "ORDERS."

■ Plaintiffs make much of the fact that ITA's regulations provide for the exclusion of firms from countervailing duty "orders," but not from the underlying countervailing duty "determinations" upon which those orders are based. *See* 19 C.F.R. § 355.38 (1987).[4] Although plaintiffs do not challenge the propriety of ITA's decision to exclude nine firms from the scope of its countervailing duty "order," they assert that ITA acted prematurely in excluding those firms from ITA's countervailing duty "determination."

Defendant responds, in part, by noting that plaintiffs' position is based on a "highly technical, but inaccurate, reading of the regulation on exclusion," Defendant's Brief at 13, and by arguing that this reading distorts the clear intent of the regulation, as the explanation set forth by Com-

---

statutory and regulatory provisions concerning the exclusion process.

....

We also wish to emphasize, however, that our support for IPSCO's position in no way implies that we are withdrawing our exclusion request....

Public Record Document Number (PR) 107, at 58.

3. Section 1671e of title 19 provides, in part, as follows.

**(a) Publication of countervailing duty order.** Within 7 days after being notified by the Commission of an affirmative determination under section 1671d(b) of this title, the administering authority shall publish a countervailing duty order which—

....

(2) shall presumptively apply to all merchandise of such class or kind exported from the country investigated, except that if—

(A) the administering authority determines that there is a significant differential between companies receiving subsidy benefits, or

(B) a State-owned enterprise is involved, the order may provide for differing countervailing duties....

19 U.S.C. § 1671e(a) (1982 and Supp. IV 1986).

4. ITA's exclusion regulation provides that

Any firm which does not benefit from a subsidy alleged or found to have been granted to other firms producing or exporting the merchandise subject to the investigation shall, on timely application therefore, be excluded from a Countervailing Duty Order. An application shall be considered timely if made within 30 days after publication of a "Notice of Initiation of Countervailing Duty Investigation." The name of any such firm which is determined to have satisfied the requirements for exclusion will be published in the Federal Register.

19 C.F.R. § 355.38 (1987).

merce at the time of its promulgation reveals:

> Ordinarily, firms wishing to be considered for exclusion from *any possible affirmative determination* should submit an application for exclusion, together with all necessary supporting documentation, no later than 30 days after the date of publication of the Notice of Initiation of Countervailing Duty Investigation.

45 Fed.Reg. 4936 (January 22, 1980) (emphasis added). Clearly, the regulation was intended to allow firms to request exclusion shortly after the initiation of an investigation so that Commerce could investigate and verify the data supplied by those companies prior to the issuance of a preliminary or final determination.

Defendant's Brief at 14.

As the agency which promulgated this regulation, ITA's interpretation of its scope and purpose is entitled to substantial weight. *Pistachio Group of the Ass'n of Food Indus. v. United States*, 11 CIT ——, 671 F.Supp. 31, 37 (1987). *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1055 (Fed.Cir.1983) *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983). In this case, ITA's interpretation does not lead to results that are inconsistent with the statute. The statute does not say how to calculate a country-wide rate when firms have *de minimis* rates. In addition, the methodology used by the agency aids in fulfilling the requirement that the countervailing duty orders reflect the results of the determination. *See Royal Business Machines v. United States*, 1 CIT 80, 86–87, 507 F.Supp. 1007, 1012–13 (1980), *aff'd*, 669 F.2d 692 (1982) (concerning antidumping duty orders). *See Badger–Powhatan v. United States*, 10 CIT ——, 633 F.Supp. 1364 (1986) (antidumping duty order must reflect the findings of the administrative decisions upon which they are based) *appeal dismissed without prejudice*, 808 F.2d 823 (Fed.Cir.1986).[5]

### D. EXCLUSION OF A FIRM RECEIVING *DE MINIMIS* BENEFITS.

█ Plaintiffs also argue that "ITA's application of [a *de minimis*] standard in the contested determination to differentiate Algoma and IPSCO on the basis that *de minimis* benefits are *per se* materially different, is not in accordance with law." Plaintiffs' Brief at 18.

This position misconstrues the nature of ITA's actions in this case. ITA did not make a determination that the difference between Algoma's *de minimis* rate of 0.05 percent and IPSCO's rate of 0.72 percent was *per se* material. ITA merely excluded Algoma based upon its finding, which is not challenged in this review, that Algoma's benefits of 0.05 percent benefits were *de minimis*. Once this determination has been made, ITA treats that firm in the same manner as it treats firms receiving no benefits whatsoever. *See Carlisle Tire & Rubber v. United States*, 1 CIT 352, 517 F.Supp. 704 (1981).

In any event, under the countervailing duty law, the issue of substantial or material differences is generally concerned with limiting ITA's discretion to overlook differences, rather than preventing it from taking differences into account. *See* 19 U.S.C. § 1671e(a)(2) (Supp. IV 1986); 19 C.F.R. § 355.33(f) (1987). Where a company is assessed duties based on its own subsidization rate, there is little ground for complaint.

### II. ITA'S METHODOLOGIES FOR CALCULATING THE VALUE OF BENEFITS

Plaintiffs raise several challenges to ITA's methods of calculating the value of benefits conferred upon. Common to each argument is plaintiffs' assertion that the law requires ITA to calculate benefits

> in such a fashion as to most closely approximate the true conferral of benefits upon the exported product. *British Steel Corp. v. United States*, 11 CIT ——, 632 F.Supp. 59 (1986). The measurement of grants must be made in the

---

**5.** The court does not hold that the agency's interpretation is the only one which could be consistent with statutory requirements, merely that it is not inconsistent.

most reasonable commercial terms and in a manner specific to each recipient in order to be reasonable within the intendment of the countervailing duty law. *Michelin Tire Corp. v. United States*, 6 CIT 320 (1983) [available on WESTLAW, 1983 WL 2515], *vacated on other grounds*, 9 CIT [38 (1985)].

Plaintiffs' Brief at 20.

To the extent that these cases may be read to support plaintiffs' propositions, they must nevertheless be viewed in light of the court's current standard of review of challenges to countervailing duty determinations. Under that standard, ITA's interpretation of the countervailing duty statute need not be the most reasonable interpretation, or the only reasonable interpretation, or even the one which the court would have adopted had the question initially arisen in judicial proceedings. *E.g. Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

Contrary to plaintiffs' assertion, in *British Steel* the court did not hold that ITA must use methods which *"most* closely approximate the true conferral of benefits." Plaintiffs' Brief at 20 (emphasis added). In *Michelin,* while the court did speak of measuring benefits in "in the most reasonable commercial terms," 6 CIT at 326, it did so within the context of a *de novo* review. As the court's prior opinions addressing the scope of its *de novo* review made clear, its review was not limited to the reasonableness, or even the correctness, of the agency determination. *See Michelin Tire Corp. v. United States*, 81 Cust.Ct. 157, C.R.D. 78–12 (1978) and *Michelin Tire Corp. v. United States*, 82 Cust.Ct. 308, 469 F.Supp. 270, *appeal dismissed*, 66 CCPA 107, 603 F.2d 192 (1979). Accordingly, the court's references to the "most reasonable" or "the correct" method of valuing grant subsidies were addressed to its own methods and findings, rather than those of ITA.

## A. ITA'S METHOD OF APPORTIONING BENEFITS FROM CAPITAL GRANTS ACCORDING TO SALES VALUE RATHER THAN WEIGHT

■ Plaintiffs argue that ITA erred in misallocating the value of grants IPSCO received for capital improvement of its steel facilities. Specifically, they argue that since the countervailable benefits "were all directed at the production of flat-rolled steel, an intermediate product which is utilized in all of IPSCO's product lines," ITA should have allocated the benefits bestowed upon its higher valued product, OCTG, "using a ratio based on the tonnage produced rather than on the basis of value of products sold." Plaintiff's Brief at 19. Plaintiffs use admittedly extreme examples to demonstrate how allocating according to value, rather than volume, can lead to absurd results in some cases and claim that, in this case, ITA arrived at a result which was unrealistic and unreasonable.

Defendant and defendant-intervenor respond that, for non-agricultural products, ITA always allocates the value of subsidies based on the product's sales value, rather than weight or volume. ITA explained that it "cannot determine, *a priori,* if a cash grant is more beneficial to the volume than the value of the goods produced. Therefore, we utilize a standard method to avoid biasing the outcome." 51 Fed.Reg. at 15,043 (comment 3). As defendant explains it, where grants are not specifically "tied" to the production of certain products, ITA's method focuses on the grant's economic impact on the recipient—the general effect it has on the company's cash flow—without assuming that the manufacturer actually applies the grant unevenly with respect to different products. Defendant's Brief at 22.

At issue here is the reasonableness of ITA's selection of a methodology as applied to the facts of this case. In their pre-hearing brief to ITA, plaintiffs applied their proposed method to the facts of this case, reallocating the value of grants by comparing the weight, rather than the value, of IPSCO's OCTG shipments to IPSCO's total shipments of all products. Confidential Record Document Number (CR) 25, at 9–12 (IPSCO's Pre-hearing Brief). Plaintiffs concluded that adoption of their method would lower ITA's subsidy finding by 0.192 percent. CR 25, at 12 & 34. Defendant-in-

tervenors objected then, as they do now, that plaintiffs' method does not take into account waste, or the extent to which "[h]igher value added steel products, such as OCTG, undergo additional and more complex manufacturing processes which have a higher percentage of yield loss than the manufacturing processes of lower value products." CR 29, at 16–17 (Petitioner's Post-hearing Brief). Plaintiffs respond by urging that their proposed methodology can be refined to account for scrap by tracing benefits through the production of flat-rolled steel and into OCTG on a usage basis according to the tonnage consumed. Plaintiffs' Reply Brief at 11.

According to plaintiffs, ITA calculated a subsidy rate which differs from plaintiffs' claimed rate by something *less than* 0.192 percent. In view of the seemingly complicated alternative offered by plaintiffs and the proximity of the results of the two methods, ITA's action does not appear unreasonable. Though not developed for these particular proceedings, the methodology, as applied to this case, is a reasonable method for assessing the commercial and competitive benefits of the subsidy at issue.

### B. ITA'S DISREGARD OF CERTAIN COMPANY SPECIFIC DATA PROVIDED BY IPSCO.

According to plaintiffs, ITA's failure to use available company specific data was inconsistent with the legislature's intent that ITA determine the commercial and competitive benefit to individual recipients as a result of the subsidy. Plaintiffs' Brief at 22 (citing S.Rep. No. 249, 96th Cong., 1st Sess. 85–86, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 471–72 and *British Steel*, 632 F.Supp. 59).

### 1. ITA'S REFUSAL TO CONSIDER CERTAIN TAX CONSEQUENCES IN DETERMINING THE VALUE OF GRANTS.

Plaintiffs argue that ITA erred in refusing to include certain after-tax considerations in calculating the benefit bestowed by the grant subsidies in this case. Plain-

tiffs argue that had IPSCO utilized commercial loans, rather than government grants, it would have been entitled to tax deductions for the interest paid on those loans and to capital cost allowances (depreciation) for assets acquired with those loans. These advantages did not flow from IPSCO's acceptance of government grants (IPSCO could neither deduct interest payments that were never made nor claim allowances for the cost incurred by the government in paying for IPSCO's capital).

ITA rejected IPSCO's request on the following grounds: 1) ITA's consistent policy is to not take secondary effects, including tax effects, into account, 2) offsets to countervailable subsidies are strictly limited by statute, and 3) IPSCO had negative taxable income in the fiscal year preceding ITA's investigation. 51 Fed.Reg. at 15,044 (comment 7).

Plaintiffs acknowledge that in *Michelin Tire v. United States*, 6 CIT 320 (1983) *vacated on other grounds* 9 CIT 38 (1985), the court rejected a claim that "the tax advantages of alternative debt financing ought to be considered to reduce the advantage which the outright grant bestows." *Id.* at 328. The court reasoned that:

> This argument cannot be accepted because it takes the administration of the law into the area of secondary effects. These effects are too uncertain to be considered a part of a subsidy calculation in these circumstances. The Court notes that Michelin Canada paid no taxes during the period involved in this case.

Plaintiffs argue, however, that "the tax consequences presented here are based upon actual computations in years during which taxes were in fact paid, and are neither uncertain nor secondary with respect to plaintiffs' financial condition." Plaintiffs' Brief at 27.

The issue here is neither one of documentation, nor of the impact upon plaintiffs' financial condition. Congress has narrowly proscribed the offsets which ITA may consider in determining net subsidies. 19 U.S. C. § 1677(6) (1982). S.Rep. No. 249, 96th Cong., 1st Sess. 85–86, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 471–

72.[6] ITA's practice of strictly interpreting section 1677(6) is well established and reasonable. *Fabricas El Carmen, S.A. v. United States,* 11 CIT ——, 672 F.Supp. 1465, 1472–73 (1987), *remand order vacated as moot,* 12 CIT ——, 680 F.Supp. 1577 (1988). Unrealized tax advantages of alternative financing are not one of the allowable offsets. 19 U.S.C. § 1677(6). Thus, ITA should have disregarded this claim as unsupported by law, regardless of whether the claimed amount has been "definitively established by reliable, verified evidence." S.Rep. No. 249, *supra,* at 86, 1979 U.S. Code Cong. & Admin.News, at 472.

## 2. ITA'S DETERMINATION OF A DISCOUNT RATE IN MEASURING THE VALUE OF GRANTS RECEIVED BY IPSCO.

■ In order to determine the benefit bestowed by a grant, ITA attempts to establish the economic effect of that grant upon the recipient. In calculating this effect, ITA spreads the value of grants over a number of years. As Congress has explained.

> There is a special problem in determining the gross subsidy with respect to a product in the case of nonrecurring subsidy grants or loans, such as those which aid an enterprise in acquiring capital equipment or a plant. Reasonable methods of allocating the value of such subsidies over the production or exportation of the products benefiting from the subsidy must be used. In particular, a reasonable period based on the commercial and

competitive benefit to the recipient as a result of the subsidy must be used.

S.Rep. No. 249, *supra,* at 85–86, 1979 U.S. Code Cong. & Admin.News, at 471–72. *See* H.Rep. No. 317, 96th Cong., 1st Sess. 74–75 (1979). One step in this process involves the determination of a discount rate, representing the value of money to the grant recipient.

Plaintiffs object to the data which ITA used to assign discount rates to IPSCO, characterizing the resulting rates as ones "which bore no relation to IPSCO whatsoever." Plaintiffs' Reply Brief at 15. Specifically, they assert that "for purposes of valuing certain grants received by IPSCO the ITA utilized a calculated weighted average cost of capital as a discount rate, which amount was computed from industry average rate of return data for debt and equity provided by the Government of Canada." Plaintiffs' Brief at 23.

From the court's reading of the record, it appears that ITA used three different discount rates in computing a subsidy rate, relying almost entirely on IPSCO specific data. The discount rates for 1971 and 1972 were represented by IPSCO's own cost of debt (the interest rate it paid on long term debt). The discount rate for 1978 was computed by a weighted average cost of capital formula.[7] This formula utilized solely IPSCO specific data for three of its four elements—cost of debt, amount of debt, and amount of equity. The final element, the cost of equity (or rate of return on equity), utilized national average data.[8]

---

**6.** Congress explicitly recognized that it was limiting existing agency practice in this area. It stated that "For purposes of determining the net subsidy, there is subtracted from the gross subsidy only the items specified in section 771(6). The list is narrowly drawn and is all inclusive. For example, offsets under present law which are permitted for indirect taxes paid but not actually rebated, or for increased costs as a result of locating in an underdeveloped area, are not now permitted as offsets." S.Rep. No. 249, *supra,* at 86, 1979 U.S.Code Cong. & Admin. News, at 472.

**7.** ITA's weighted cost of capital formula combines the interest rates which a firm pays on money it borrows with the rate of return it receives on its equity in a manner which reflects

the extent to which it uses each form of financing. Thus, for example, assuming a firm borrows money at the rate of 6 percent, and receives a 9 percent return on its equity. If the two rates were simply averaged, the resulting unweighted average would be 7.5 percent (half way between 6 and 9 percent). Suppose, in addition, that the firm uses twice as much equity financing as debt financing. Averaging the 6 and 9 percent rates proportionately, the weighted average result would be 8 percent (or two-thirds of the way between 6 and 9 percent).

**8.** Defendant explains that ITA based its cost of equity figure upon the difference between the national average return on equity and the national average cost of debt, and added this difference to IPSCO's own cost of debt. Defend-

Thus, the basis for plaintiffs' challenge to ITA's use of "other than IPSCO specific data" rests entirely upon ITA's use of national average data in calculating the cost of equity portion of its weighted cost of capital formula, which in turn was used as a discount rate for 1978. Plaintiffs' arguments to this court, however, do not specifically focus on the cost of equity portion of the weighted cost of capital formula, and only address this issue by reference to IPSCO's pre-hearing brief. An examination of the data provided in IPSCO's pre-hearing brief, CR 25, and subsequently verified by ITA, PR 124 & 125, reveals that IPSCO's own rate of return on equity in 1978 equaled the cost of equity percentage used by ITA.[9] Accordingly, in this particular case, the use of national rate of return on equity in the calculation of a weighted cost of capital formula did not overstate the actual benefit to IPSCO.

Plaintiff has made further challenges to the method of grant valuation based on the reasonableness of ITA's refusal to use alternative IPSCO specific data.

### a. ITA's use of IPSCO's long-term, rather than short-term, loans.

Plaintiffs challenge ITA's failure to use IPSCO's own short-term, rather than long-term, loans in determining its discount rates. ITA explained its reasons for not using IPSCO's short-term interest rate as follows:

The project, partially funded by the grant, was built over several successive years. It was a major capital expansion. During the years that the project was being built, IPSCO floated two 15-year debenture issues at higher interest rates than IPSCO suggests we use for calculation purposes. To say that this large capital expansion project would have been financed by short-term borrowings is purely speculative and unsupported by any verified facts. In general, firms use long-term debt or equity to finance such long-term projects.

51 Fed.Reg. at 15,044 (comment 5).

Plaintiffs respond by claiming that the "[w]hile the ITA may have felt that 'it was unlikely' that IPSCO would have used short-term financing the record is devoid of evidence to the contrary and ITA's decision is no more than supposition which ignores IPSCO's obvious familiarity with the manner in which it conducts its own business.... [T]he obvious question is how, based on the record before it, the ITA could assume that a discount rate which bore no relation to IPSCO whatsoever would be more accurate than the two alternatives suggested by the company." Plaintiffs' Reply Brief at 14–15.[10]

ant's Response to the Court's letter of March 17, 1987. The specific numbers which appear in ITA's calculations do not appear to be consistent with this explanation. CR 23, at [875A–76A], [878A]; CR 33, at [1204A], [1221A] (Bracketed numbers indicate microfilm frame numbers). In any event, whether derived solely from one set of national average figures, or from two sets in conjunction with IPSCO specific data, the resulting percentage which ITA assigned as the cost of equity in this case is not in dispute. Plaintiffs' and Defendant's Responses to the Court's letter of March 17, 1987.

9. Although the cost of equity figure used by ITA is carried out a decimal place further than IPSCO's rate of return on equity figure for 1978, the figures are identical when expressed to the same number of decimal places (either by rounding off ITA's figure, or recalculating IPSCO's figure to an additional decimal place). Compare CR 21, PR 124 and CR 25, at app. [926A–29A] with CR 23, at [875A–76A], [878A] and CR 33, at [1204A], [1221A].

IPSCO argued to ITA that its 1977 cost of equity figures (and its 1978 cost of debt figures) should be used in determining a weighted cost of capital for 1978. CR 25, at 17. The court finds it reasonable for ITA to use 1978 data in computing a 1978 rate. Thus, had ITA decided to use IPSCO specific data entirely, the court would not direct it to use 1977 IPSCO data.

10. Plaintiffs also assert that its "position is amply supported in the briefs and materials filed with [ITA] at, and in connection with, the hearing: There was nothing unverifiable about these data." Plaintiffs' Reply Brief at 16. The court has reviewed the record and does not find anything which undermines the reasonableness of ITA's use of IPSCO's own long term financing. IPSCO's pre-hearing brief on this point asserts, without support, that "Had the grants not been received, the shortfall would doubtlessly have been financed with short-term debt." CR 25, at 16. At the hearing, it was again asserted that "IPSCO in 1978 would clearly have found it to be to its best interest to utilize short term debt as the alternate financing if the government grant had not been given ..." and explained that this was because short term debt "would

As previously indicated, the discount rates used by ITA were specific to IPSCO. ITA's decision to use IPSCO's long-term interest rates, rather than IPSCO's short-term interest rates, was based not upon some arbitrary choice, but rather upon specific findings regarding the grants and loans received by IPSCO. Having found that the grants were essentially of a long-term nature, and that IPSCO actually incurred long-term loans during the same period, it was reasonable for ITA to conclude that the commercial benefit of those grants was better reflected by the terms of IPSCO's long-term financing. The fact that IPSCO provided ITA with data on short-term loans neither establishes the appropriateness of that data, nor renders ITA's decision unreasonable.[11]

b. ITA's use of IPSCO's debt to equity ratio in 1978, rather than its historic debt to equity ratio, in calculating a weighted cost of capital.

■ Plaintiffs argue that ITA erred in using IPSCO's ratio for debt to equity in 1978, rather than IPSCO's historic debt to equity ratio—the average of IPSCO's annual debt to equity ratios for the years 1957 to 1984—in calculating the weighted cost of capital. That weighted cost of capital was used as the discount rate in measuring the benefit bestowed by a grant approved in 1978.

ITA responded to IPSCO's request by explaining that "a debt to equity ratio affected by other time periods would not reflect the cost to the company of raising money *at the time the subsidy was approved.* Furthermore, the proposed method does not use standardized times over which one company's time preference for money could be compared to another." 51

Fed.Reg. at 15,043–44 (comment 4) (emphasis added).

The court finds ITA's use of data which was specific to IPSCO and to the year in which the grant was approved, instead of data which spanned a period from IPSCO's first year of operation until after the grant had been approved, to be reasonable.

3. ITA'S USE OF A STANDARD 15 YEAR DEPRECIATION SCHEDULE, RATHER THAN IPSCO'S OWN 25 YEAR SCHEDULE, IN ALLOCATING THE VALUE OF GRANTS OVER TIME.

■ In determining the economic effect of grants, ITA must determine a reasonable period over which to spread the value of the grant, "based upon the commercial and competitive benefit to the recipient." S.Rep. No. 249, *supra*, at 85–86, 1979 U.S. Code Cong. & Admin.News at 471–72. In this case, ITA determined an allocation (or amortization) period, in accordance with its methodology set forth in *Cold-Rolled Carbon Steel Flat–Rolled Prods. from Argentina*, 49 Fed.Reg. 18,006, 18,016–20 (Apr. 26, 1984) (Subsidies Appendix). Specifically, ITA explained that

In the Subsidies appendix, we state that we will allocate grants over the average useful life of a company's renewable physical assets as determined by the U.S. Internal Revenue Service (IRS) in the 1977 Class Life Asset Depreciation Range System. That is the source of the 15–year allocation period used in this case. We feel the use of the IRS tables provides a consistent and predictable standard for allocating grants. If we were to use different countries' tax ta-

have been the lowest cost financing available to use at the time." PR 107, at 23–24 (testimony of Mr. Della–Vincenza). IPSCO's pre-hearing brief and the hearing testimony each seek to establish that short term financing would have been available to it at the time. CR 25, at 16; PR 107, at 23. That, utilizing hindsight, one can say that if IPSCO had used short term debt to finance its long term projects in 1978 it "would clearly have found it to be to its best interest" because that financing would have been the least expensive, is not determinative.

11. Plaintiffs' arguments to this court regarding IPSCO's short-term borrowing rate are directed at their utilization "as a discount rate." Plaintiffs have also argued in the past that IPSCO's short-term borrowing rate should be used as the cost of debt as one element in ITA's weighted average cost of capital formula. CR 25, at 17 (IPSCO's Pre-hearing Brief). A similar analysis applies to both situations, however, since the choice is still between using IPSCO's short-term, or long-term, debt financing.

bles or different companies' amortization periods for allocating grant benefits, we might arrive at different subsidy rates for equal grants due solely to the different periods of allocation.

51 Fed.Reg. at 15,044 (comment 6). In so doing, ITA rejected IPSCO's request to have the value of its grants allocated over the 25 year period that IPSCO actually used in its financial reporting.

Plaintiffs claim that "ITA was aware and verified IPSCO's standard practice of accounting for the gradual actual physical depreciation of its capital assets," and conclude that

> Absent evidence that such practice was not in accordance with generally accepted accounting practices or distortive of plaintiffs' results, the ITA's proper course was to accept IPSCO's contention and value the grants in question in the same manner as IPSCO, namely, over the useful life period of the assets to which the grants applied.

Plaintiffs' Reply Brief at 18 (citing H.R. Rep. No. 317, *supra,* at 75 which stated that reasonable "methods should include ... relating the value of a subsidy for acquiring assets to their anticipated useful life, based on generally accepted accounting principles.").

ITA did not find anything questionable about IPSCO's accounting practice. Specifically, ITA stated that

> In this case we have found that, while IPSCO and other Canadian primary and secondary steel producers may amortize capital equipment expenditures over 25 years, we are aware of nothing that requires them to do so. Accepting that IPSCO depreciates capital equipment for

financial statement purposes over a 25–year period, the majority of this equipment is depreciated for tax purposes by IPSCO over a two-year period with the remainder depreciated for tax purposes over other intervals. The Canadian government accepts these various methods. So even if we did attempt to find a company-or country-specific allocation period, there is often no clear choice of what that period should be.

51 Fed.Reg. at 15,044 (comment 6).

ITA's task in this case was to use a "reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy." S.Rep. No. 249, *supra,* at 85–86, 1979 U.S.Code Cong. & Admin.News, at 471–72. The fact that "there is often no clear choice of what that period should be," 51 Fed.Reg. at 15,044 (comment 6), does not address the question of whether a particular period is or isn't reasonable, in this case.[12] Simply applying a standard method, in the name of consistency and predictability, does not ensure the reasonableness of either the method, or the resulting period, in this or any other particular case. This is especially apparent in light of the emphasis which Congress has placed on discerning the commercial and competitive benefit to the recipient. As ITA has acknowledged on other occasions, its choice of a standard 15–year allocation period based upon the average lifetime of equipment as determined in the Subsidies Appendix "is arbitrary in the sense that there are several viable options from which it could choose." *British Steel,* 632 F.Supp. at 67 (1986) (citing document 2 of ITA's record on remand).[13] *See* 632 F.Supp. at 69.

---

**12.** In this regard plaintiffs argue that "If the presence of alternate depreciable lives for tax purposes impairs a firm's actual accounting experience, then surely the IRS tables, which differ substantially from the periods available under ACRS [Accelerated Cost Recovery System, *see* 26 U.S.C. § 168 (1982 and Supp. III 1985) ], must suffer a like infirmity rendering the IRS tables, at a minimum, no less authoritative than plaintiffs' actual practice." Plaintiffs' Reply Brief at 17–18. It is noteworthy that, in other circumstances, ITA acknowledges that "The term 'GAAP' [Generally Accepted Accounting Principles] has reference to financial statement

principles, not local tax principles." ITA Policy Paper No. 23 ("Application of Generally Accepted Accounting Principles to the Cost of Production Provision").

**13.** In *British Steel,* the court was confronted with ITA's use of the same Subsidies Appendix in allocating subsidies arising from certain equity infusions over 15 years, irrespective of the use to which the funds were put. The court held that

> linking the commercial and competitive benefit of the [non-capital] subsidies at issue to the

Absent the existence of a properly promulgated rule governing ITA's selection of allocation periods (addressed in the following section) ITA must explain the basis for its decision based on the facts of this case. *Carlisle Tire & Rubber Co. v. United States,* 10 CIT ——, 634 F.Supp. 419, 423 (1986) (and cases cited therein). In this respect, ITA has failed to provide a non-arbitrary basis for its decision to use a 15 year period that was derived from standardized IRS data on the useful life of equipment in the U.S. Steel industry, rather than a period that could be derived from verified information pertaining to the country and company under investigation in this case.[14]

## III. ITA'S APPLICATION OF THE SUBSIDIES APPENDIX.[15]

Plaintiffs argue that

ITA's issuance of the Subsidies Appendix as a comprehensive set of rules and guidelines for application to future countervailing duty investigations and its application of same to the contested determination was contrary to the requirements of the Administrative Procedure Act ("APA") and, therefore, not in accordance with law."

Plaintiffs' Brief at 28. Although plaintiffs have argued that ITA erred generally in referring to the Subsidies Appendix, the court sees only one instance in this case in which dependence on the Subsidies Appendix led to both a violation of law and prejudice to plaintiffs. That instance is the previously discussed use of a 15–year allocation period.

Defendants have not argued that the use of a 15 year allocation period is based on some information of record, rather they seem to accept that use of the 15 year period was justified only by an external factor, the "principle" stated in the Subsidies Appendix.[16] They support use of the 15–year period from the Subsidies Appendix by contending that Congress did not intend ITA to be governed by APA requirements, that ITA is free to develop new principles on a case-by-case adjudicatory basis rather than by formal rulemaking, that following APA rulemaking requirements would deprive ITA of its much needed flexibility in this area, and that plaintiffs were afforded ample opportunities for notice and comment in this case. Each of these statements is true in some sense, but none justifies the use of an arbitrary allocation period.

## A. THE SCOPE OF APA RULEMAKING PROCEDURES.

 The APA provides that " 'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. § 551(4) (1982). APA's notice and comment requirements do not apply, however, "to interpretive rules, general state-

---

15–year average useful life of capital assets in the U.S. steel industry, while administratively convenient, is unreasonable and not in accord with Congressional intent that the benefits be allocated over a period of time reflecting *the commercial and competitive benefit of the subsidy to the recipient.* *British Steel,* 632 F.Supp. at 68. Defendant mischaracterizes this case when it states that the court "found it reasonable to use the 15 year amortization period for long-term capital assets." Defendant's Brief at 29, n. 28. To the extent that the court touched upon the amortization of long-term capital assets, it questioned the basis for ITA's use of such a period. *See* 632 F.Supp. at 69.

**14.** The court does not hold that ITA must use IPSCO's 25 year period, but rather that it must

select a period which is reasonable in this case, and explain the basis for its decision in terms of the facts of this case.

**15.** *Cold–Rolled Carbon Steel Flat–Rolled Prods. from Argentina,* 49 Fed.Reg. 18,006, 18,016–20 (Apr. 26, 1984) (Subsidies Appendix).

**16.** Specifically, ITA articulated that principle as follows: "We will allocate all other grants over the average useful life of a company's renewable physical assets (equipment) as determined by U.S. Internal Revenue Service (IRS) in the 1977 Class Life Asset Depreciation Range System (Rev.Proc. 77–10, 1977—1 C.B. 548 (RR–38))." Subsidies Appendix, 49 Fed.Reg. at 18,-018. These "other grants" referred to grants which total more than 0.50 percent of a firm's sales.

ments of policy or procedure, or practice." 5 U.S.C. § 553(b)(A) (1982).

Generally, these procedures apply to agency actions that carry the force of law —"legislative" or "substantive" rules which implement congressional intent, effectuate statutory purposes, grant rights, impose obligations, or produce other significant effects on private interests and which limit the discretion of agency officials "by largely determining the issue addressed." *Batterton v. Marshall*, 648 F.2d 694, 701–02 (D.C.Cir.1980). In contrast, APA rulemaking requirements generally do not apply to non-binding agency actions—statements of an agency's interpretation, policy or internal practice or procedure which "express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities." *Id.*

ITA has characterized the Subsidies Appendix as "a detailed explanation of the current countervailing duty methodology we use to examine grants, loans, loan guarantees, and equity." Subsidies Appendix, 49 Fed.Reg. at 18,016. Viewed in light of APA's distinctions between agency statements that carry the force of law, and those that don't, such explanations could generally fall outside of APA's rulemaking procedures. To the extent that they express the ITA's tentative views and interpretations, which are not applied as binding or authoritative statements, they fall outside of the scope of APA's rulemaking procedures.

The Subsidies Appendix is not entirely limited, however, to merely providing explanations and tentative interpretations. As the discussion in the previous section indicated, the Subsidies Appendix also adopts a hard and fast rule regarding the period of time over which to allocate benefits received from grants. In that regard, ITA noted in the Subsidies Appendix that there were several alternative standards available to it, but concluded "that there are no economic or financial rules that mandate the choice of an allocation period. The administering authority therefore must set a standard and hold to it as consistently as possible to allow its actions to be predictable." Subsidies Appendix, 49 Fed. Reg. at 18,018. Having set that standard, ITA held to it in this case, rejecting a period based upon IPSCO's verified information as contrary to the standard set forth in the Subsidies Appendix. 51 Fed. Reg. at 15,044; Defendant's Brief at 27.

The adoption of this standard in the Subsidies Appendix falls within APA's broad definition of a rule in that it is a "statement designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). *See Batterton*, 648 F.2d at 704–05. It is more than merely a statement of general policy, in that it attempts to limit the exercise of discretion in individual cases, and has present as well as prospective effect. *Carlisle Tire & Rubber Co. v. United States*, 10 CIT ——, 634 F.Supp. 419, 423 (1986) (holding that any ITA "rule" which determines that a particular percentage is *de minimis* must be promulgated in accordance with APA notice and comment provisions). In addition, to the extent that it creates new law, rights or duties it is more than an "interpretive rule." *Id.*

### B. CONGRESSIONAL WAIVER OF APA REQUIREMENTS IN COUNTERVAILING DUTY CASES.

Defendant argues that Congress intended to exclude countervailing duty proceedings from APA requirements, citing 19 U.S.C. § 1677c(b) (1982) and H.R.Rep. No. 317, 96th Cong., 1st Sess. 181 (1979), and that "In lieu of formal rulemaking procedures, Congress has provided strict requirements for notice and comment in every countervailing duty investigation or review proceeding." Defendant's Brief at 34. Defendant then relies upon the following portion of ITA's final determination:

Congress would not have waived the APA requirements for hearings, where the parties are invited to comment, if it expected compliance with the APA concerning the methodology employed. It is clear that Congress, recognizing the nature of countervailing duty proceedings, provided a system of notice and comment

that protects the same rights protected under the APA, without hampering the work of the Department.

51 Fed.Reg. at 15,045 (comment 9).

This interpretation of Congressional waiver does not appear to be longstanding, consistent, or contemporaneous with the statute. At the time the present countervailing duty law was enacted, neither the United States Department of Treasury, which administered U.S. countervailing duty law, nor ITA, which took over that function, interpreted the statute to waive APA rulemaking requirements. Both agencies utilized formal notice and comment procedures in proposing and adopting countervailing duty regulations to implement the new law.[17] ITA's subsequent amendments of its countervailing duty regulations are similarly silent with respect to any claim of a Congressional exemption from APA rulemaking procedures.[18]

Although Congress has exempted countervailing duty proceedings from APA adjudication requirements, it has not granted ITA a broad waiver from APA's rulemaking requirements. Congressional exemption of countervailing investigations from APA adjudication requirements is founded upon explicit waivers, 19 U.S.C. § 1677c (1982) (excluding hearings from APA adjudication requirements),[19] and the provision of alternative procedural protections. See 19 U.S.C. §§ 1671a(c)(2)–(3), 1671b(b) & (f), 1671c(a), (e)–(i), 1671d(a) & (d), 1675(a)(1), (b) & (d), 1677c, 1677e(a), & 1677f (1982 & Supp. IV 1986).[20] On the other hand, Congress neither waived APA rulemaking requirements for ITA, nor provided alternative rulemaking procedures.[21]

17. Before ITA replaced Treasury as the administering authority, it published a notice of proposed regulations, invited written comments and announced an open conference to discuss the proposed amendments. Proposed Revision of the Customs Regulations Relating to Countervailing Duties, 44 Fed.Reg. 57,044, 57,046 (Oct. 3, 1979) (notice of proposed rulemaking). In anticipation of the transfer of functions from Treasury to ITA, the two agencies jointly reviewed and considered the comments received on the proposed regulations and jointly prepared final regulations. Countervailing Duties, 45 Fed.Reg. 4,932 (Jan. 22, 1980) (final rules and request for comments). In promulgating those final regulations, ITA did not interpret the recently enacted countervailing duty law as waiving APA rulemaking requirements. Instead, ITA explicitly made a determination under 5 U.S.C. § 553(d)(3) setting forth why the published regulations should take effect immediately (rather than after the APA's 30 day waiting period). Id. at 4,932.

18. ITA has provided full notice and comment in some cases. 51 Fed.Reg. 35,529 (Oct. 6, 1986) (proposed de minimis rule), 52 Fed.Reg. 30,660 (Aug. 17, 1987) (final de minimis rule), 50 Fed. Reg. 24,207 (Jun. 10, 1985) (proposed revisions to various rules), 52 Fed.Reg. 25,246 (Jul. 6, 1987) (proposed sanctions for violation of protective orders). On other occasions, ITA has made specific determinations pursuant to 5 U.S.C. §§ 553(b)(A)–(B), 553(d)(3), that the rules under consideration fell within one of the APA exemptions (often maintaining some provision for public notice and comment). 45 Fed.Reg. 4,932 (Jan. 22, 1980) (final adoption of part 355 rules) (additional notice and comment unnecessary); 49 Fed.Reg. 22,467 (May 30, 1984) (final

rule on submission of information) (agency practice and procedure); 50 Fed.Reg. 5746 (Feb. 12, 1985) (interim-final rule on effective dates of 1984 Act) (interpretive rule); 50 Fed.Reg. 32,-556, 32,558 (Aug. 13, 1985) (interim-final and final rules on timeliness of administrative review requests) (procedural rule under APA, citing Lamoille Valley R. Co. v. ICC, 711 F.2d 295, 328 (D.C.Cir.1983)).

19. Section 1677c of title 19, upon which defendant relies, governs hearing procedures, and specifically states that hearings "shall not be subject to the provisions of subchapter II of chapter 5 of title 5, or to section 702 of such title." 19 U.S.C. § 1677c(b). By this general reference, Congress explained that it intended to ensure that "hearings would not be subject to the provisions of sections 554, 555, 556, 557, and 702 of Title 5 of the United States Code relating to adjudicative hearings." S.Rep. 249, supra, at 97, 1979 U.S.Code Cong. & Admin.News, at 483.

20. The legislative history cited by defendants indicates that such protections were provided, in the absence of APA adjudicative procedures, in order to facilitate the development of agency records, and in turn, judicial review based upon that record, rather than upon a de novo inquiry. H.R.Rep. No. 317, supra, at 181.

21. Congress did anticipate, however, that ITA would engage in formal rulemaking. In defining the term subsidy, Congress explained that "a 'subsidy' includes those export subsidies enumerated or described in Annex A to the Agreement on Subsidies and Countervailing Measures and such practices which may be added by regulation by the Authority.... The Committee expects that as new practices become internation-

## C. ITA'S NEED FOR FLEXIBILITY AND DISCRETION TO DEVELOP RULES ON A CASE BY CASE BASIS.

Defendant argues that ITA has the discretion to proceed on a case-by-case basis, without utilizing formal rulemaking procedures. As ITA stated:

[A]n investigative agency, such as the Department of Commerce, has the discretion to develop general policies on a case-by-case basis rather than through rulemaking procedures. (See *NLRB v. Bell Aerospace Company,* 416 U.S. 267, 290–295 [94 S.Ct. 1757, 1769–72, 40 L.Ed.2d 134] (1973)). IPSCO seeks to have the Department follow a fairly rigid standard with regard to all methodologies used. The responsibilities of the Department preclude strict compliance with the APA. Because of the large number of government programs that confer subsidies, the Department needs the flexibility to formulate and adjust methodologies that are applicable to the various government programs.

51 Fed.Reg. at 15,044 (comment 9).

Plaintiffs' do not dispute ITA's right to develop its substantive policy positions on a case-by-case basis, rather than by adopting formal rulemaking procedures.[22] They argue, however, that

Once it selected particular methodologies for dealing with recurrent subsidy practices with which it had prior experience and decided to publish those rules, the ITA should have pursued rulemaking pursuant to the Administrative Procedures Act, with an opportunity for interested parties in addition to those involved in *Cold–Rolled Carbon Steel Flat-Rolled Products from Argentina* to comment on the approaches being adopted. By selecting methodologies for use in future cases without an opportunity for input from potentially affected interests, the ITA violated the letter and spirit of the rulemaking requirements of the APA.

Plaintiffs' Reply Brief at 20–21 (footnote omitted).

This distinction between developing or identifying appropriate methodologies through case-by-case adjudication, and selecting particular methodologies in accordance with formal rulemaking procedures, appears to reflect the course which ITA announced it would pursue when it adopted its first set of countervailing duty regulations. At that time, ITA announced that it was *"deferring* publication of final regulations" covering methodologies for the calculation of subsidies and allocation of grants over time,[23] explaining that "the

---

ally recognized, the Authority will, *by regulation,* augment the enumerations under subparagraphs (A) and (B) of subsection (5)." H.R.Rep. 317, *supra,* at 74 (emphasis added).

**22.** Specifically, plaintiffs describe their position as follows:

Defendant cites substantial authority for the proposition that, generally, agencies are not required to adopt formal rulemaking procedures whenever a substantive policy is developed. Rather, agencies may proceed by a method of adjudication and develop positions on a case-by-case basis. Plaintiffs do not disagree with this restatement of a basic legal principle. This rule of law, however, has no application to the matter at hand.

Plaintiffs have not postulated that the ITA ought to have developed the Subsidies Appendix by way of rulemaking rather than adjudication. Indeed, it was reasonable for ITA to have waited, as it did, until it had experience with "[c]ertain types of capital and financial subsidies, including grants, loans, loan guarantees, and equity, [which] have arisen in a

number of countervailing duty proceedings" before selecting the particular methodologies "that we believe best implement the policies and purposes of [the countervailing duty] law." 49 Fed.Reg. 18006, 18016.

Plaintiffs' Reply Brief at 20.

**23.** Specifically, ITA announced that it was "deferring publication of final regulations covered by certain sections of the proposed regulations of the Customs Service published in the Federal Register on October 3, 1979; principally those provisions relating to the proposed Subpart A respecting the determination and calculation of net subsidy and specifically sections 155.1, 155.-2, 155.3, 155.4...." 45 Fed.Reg. at 4,932. Proposed section 155.4 provided for the allocation of grants over time. It read, in part, as follows:

(a) The amount of a subsidy shall be calculated by reference to its value as of the time it is received and used by the recipient. In calculating the *ad valorem* effect of non-recurring subsidies, such as grants, loans or loan guarantees, used to acquire productive assets, the value of such subsidies shall be allocated

Department prefers to gain as much experience as possible on these issues *prior to publishing final regulations.*" Countervailing Duties, 45 Fed.Reg. 4,932 (Jan. 22, 1980) (emphasis added).

■ It is apparent that when ITA announced its decision to "set a standard and hold to it as consistently as possible," Subsidies Appendix, 49 Fed.Reg. at 18,018, it had moved beyond the case by case process of identifying, formulating and adjusting standards for allocating grants over time. This "fairly rigid standard" was self-imposed by ITA in its Subsidies Appendix. ITA necessarily gave up some of its flexibility in embracing this consistent and predictable standard. ITA held fast to that standard, applying it two years later in this case, without modification or adjustment, and independent of the particular facts of this case. The court does not see at this point how "[s]trict compliance with the APA formal rulemaking procedures, including the requirement that rules go into effect at least 30 days after publication, would severely retard the Department's ability to meet its obligation with r[e]gard to the countervailing duty law." 51 Fed. Reg. at 15,044.[24]

## D. OPPORTUNITY FOR NOTICE AND COMMENT.

ITA argues that it has provided adequate opportunities for notice and comment. Such opportunities were first provided at

the time the Appendix was published, and later at the time the Appendix was applied to plaintiffs in this case. The only comments considered by ITA at the time the Subsidies Appendix was published were those of the parties to the underlying investigation (*Cold–Rolled Carbon Steel Flat–Rolled Prods. from Argentina*, 49 Fed. Reg. 18,006 (Apr. 26, 1984)).[25] Plaintiffs argue that since they were not a party to that investigation, they had no opportunity to comment on ITA's methodology prior to its adoption. In addition, they argue that once ITA adopted a blanket rule in an earlier case,[26] their opportunity to comment was of no consequence. Specifically, they state that "If the existence of the Subsidies Appendix is by itself sufficient to defeat any argument contrary to the policies stated therein, then it is meaningless that each respondent has an opportunity to comment on the methodologies contained in the Appendix in the investigations to which the rules of the Appendix are applied." Plaintiffs' Brief at 33.

If ITA wishes to avoid APA's formal rulemaking requirements by affording opportunities for notice and comment in each investigation, then it must explain the basis for its decision in each case, based upon the record before it. This is not accomplished by rejecting, without case specific explanation, verified information merely because it leads to conclusions that are different from those mandated by an admittedly arbitrary

---

over the production of the products benefitting from the subsidy, during the anticipated useful life of the productive asset, based on generally accepted accounting principles, or, when deemed appropriate by the Secretary, during any other period of time determined to reflect more accurately the value of the subsidy....

Proposed Revision of the Customs Regulations to Countervailing Duties, 44 Fed.Reg. 57,044, 57,047 (Oct. 3, 1979).

**24.** ITA's initial adoption of its countervailing duty regulations demonstrates the flexibility of APA's rulemaking procedures. 45 Fed.Reg. at 4,932. In addition, ITA noted that, with respect to the deferred regulations on subsidy calculations and allocation periods, "Final regulations on these issue are not necessary immediately for the conduct of the countervailing duty program." *Id.*

**25.** No objections were received with regard to the adoption of a standard for allocating grants over time. 49 Fed.Reg. at 18,018.

**26.** ITA's actions in this respect are distinguishable from those which were challenged in *Michelin*, 6 CIT at 322–23. In that case ITA had sought to comply with the court's previous remand order by incorporating a method which took account of the time value of money. Plaintiff challenged ITA's use of this method as an unlawful retroactive application of an administrative rule and as a rule adopted without satisfying APA rulemaking requirements. In rejecting this challenge, the court noted that the method arose from ITA's investigative obligations in that particular case, that it was not, and need not have been a continuation of previous administrative practices, and that the parties had a full and fair opportunity to comment and provide information. *Id.*

standard adopted under different circumstances. Not every aspect of the Subsidies Appendix falls into the same category as the 15–year allocation rule. Some aspects are, no doubt, interpretative or tentative. The court's ruling rests on the application of the fixed rule independent of the facts of record, that is, the apparent lack of consideration of plaintiffs' data merely because of the existence of a "rule" in the Subsidies Appendix.[27]

## IV. GRANTS "GENERALLY AVAILABLE" WITHIN THE PROVINCE OF SASKATCHEWAN.

■ IPSCO received two grants under the Saskatchewan Iron, Steel and Other Related Metal Industries Subsidiary Agreement (Saskatchewan Iron Agreement). Such subsidiary agreements were entered into between departments of the federal and provincial governments, pursuant to umbrella agreements referred to as General Development Agreements (GDAs). ITA examined the Saskatchewan Iron Agreement, and determined that:

IPSCO was and still is the only producer in Saskatchewan of pipe (including OCTG) in addition to being the sole steel producer in the province. IPSCO received most of the funds the province budgeted for primary and secondary steel facilities under the subsidiary agreement. As such, we determine this subsidiary agreement to be countervailable because it provided direct financial assistance that was limited to a specific

enterprise or industry, or group of enterprises or industries.

51 Fed.Reg. at 15,040.

Plaintiffs argue that "By limiting its analysis to the agreement applicable to the iron and steel industry and substantially ignoring like and related agreements applying to other industries, the ITA's approach permitted but one result, a result not supported by substantial evidence and not in accordance with law." Plaintiffs' Reply Brief at 29. Instead, they argue that

where, as in the contested determination, parallel programs sharing a common root provide nominally equivalent benefits to multiple industries, the ITA must look to the benefits conferred and consider whether equivalent benefits are conferred on other enterprises or industries. This test, which asks de facto whether benefits are specific rather than whether a particular program is specific is in accord with the rationale in Alberta Pork Producers and consistent with the underlying premise of the law that the actual amount of benefit conferred is the measure of any countervailing duties.

Plaintiffs' Reply Brief at 30–31.

ITA explained its approach in this case as follows:

As we stated in Groundfish, GDAs are not programs, per se. They do not establish government programs, nor do they provide for the administration and funding of government programs. They are merely legal agreements under which the departments of the federal and provincial governments may cooperate in establishing and administering joint eco-

---

**27.** Plaintiffs' also challenge the methodologies contained in the Subsidies Appendix as a retroactive tax. Plaintiffs argue that "While retroactive application is not conclusively barred by law, the general rule disfavors retroactivity unless the benefits of such application clearly outweigh any prejudice resulting therefrom." Plaintiffs' Brief at 34 (citations omitted).

Plaintiffs argue that "Because those methodologies postdate the grants in question, they have altered plaintiffs liability retroactively, changing the value of the subsidies in a fashion not foreseeable when the grants were applied for, approved, or distributed." Plaintiffs' Reply Brief at 28. In addition, they assert that by applying ITA's pre-Subsidies Appendix methodologies

"plaintiffs could predict at the time of acceptance of the grant in question that liability under U.S. countervailing duty law would be non-existent." Plaintiffs' Brief at 35 (emphasis added).

Plaintiffs leave unanswered the questions of whether such a prediction was, in fact, made, and whether prior knowledge of 0.72 percent U.S. countervailing duty deposits would have had any effect upon their acceptance and utilization of outright grants as opposed to commercial loans. In light of plaintiffs' position that retroactivity is not barred, and their failure to demonstrate any sort of actual prejudicial reliance upon pre-existing law, this argument does not succeed.

nomic development programs in spheres of dual or conflicting jurisdiction. The implementation, administration, and funding of industry and regional-specific programs occurs exclusively through subsidiary agreements. Therefore, we decided that in determining whether a subsidiary agreement is limited to specific enterprises or industries, the proper level of analysis is the subsidiary agreement.

51 Fed.Reg. at 15,043 (comment 2).

The cases cited by plaintiffs concerned the question of whether a given program provides equivalent benefits to a specific group of enterprises or industries. Where the terms of that program do not appear to be limited to a specific group of enterprises or industries, it may still be countervailable if its benefits are, in practice, bestowed upon a specific group of enterprises or industries. *PPG Industries v. United States*, 11 CIT ——, ——, 662 F.Supp. 258, 265 (1987). Applying this *de facto* case by case analysis enables ITA to avoid the absurdity of a rule that transforms a subsidy into a non-countervailable benefit merely by extending its nominal availability. *Cabot Corp. v. United States*, 9 CIT 489, 498, 620 F.Supp. 722, 732 (1985) *appeal dismissed*, 788 F.2d 1539 (Fed.Cir.1986), *remand order vacated as moot*, No. 83–07–01044 (CIT Nov. 20, 1986).[28]

In this case, ITA has found that the Saskatchewan Iron Agreement is limited, by its very terms, and in fact, to a specific industry or group of industries. ITA has also determined that it is this agreement that provides for the establishment, implementation, administration, and funding of the subsidy program at issue. Upon these factual findings, ITA has analyzed the agreement and concluded that it provides benefits to a specific enterprise or industry, or group of enterprises or industries.

The record in this case does not support plaintiffs' position that ITA erred in failing to examine other agreements, containing their own provisions for the establishment, implementation, administration and funding of programs covering other industries. It is unclear from the record whether other comparable agreements were, in fact, in existence at the time of ITA's investigation. *See* CR 25, at app. 5.[29] In addition, plaintiffs did not establish the nature of these agreements and the benefits they bestow but merely asserted that "it is IPSCO's understanding that benefits comparable to those which IPSCO received are available to all other recognized industries in Saskatchewan on comparable terms." CR 25, at 32.[30]

Based upon the current law and the agency record, the court finds that ITA did not err in determining that the benefits provided under the subsidiary agreement were limited to a specific enterprise or enterprises.

### CONCLUSION

This determination is remanded for reconsideration consistent with this opinion. A new determination is to be issued within 20 days.

SO ORDERED.

---

**28.** *See PPG Industries v. United States*, 11 CIT ——, ——, 660 F.Supp. 965, 971–72 (1987) (discussing scope of vacatur).

**29.** Plaintiffs assert that "The Subsidiary Agreements signed between the Province of Saskatchewan and the Canadian government cover all industries situated in the Province." Plaintiffs' Brief at 38 (citing to CR 25, at app. 5. The reference cited in support of plaintiffs' assertion merely states, however, in relevant part, that Saskatchewan has a small industrial base and, as such, a number of subsidiary agreements are likely to cover the entire range of industries, including iron and steel, within a fairly short timeframe.
CR 25, at app. 5 (letter of January 6, 1986 from the Deputy Minister of Saskatchewan Economic Development and Trade to the president of IPSCO, for submission in connection with this investigation).

**30.** Because of the factual underpinnings of ITA's decision, the court declines plaintiffs' invitation to address the issue of general availability within a limited geographical area.