**PPG INDUSTRIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Vitro Flex, S.A. and Cristales Inastillables De Mexico, S.A., Defendant–Intervenors.**

**Court No. 86–12–01546.**

United States Court of International Trade.

Aug. 9, 1990.

See also 708 F.Supp. 1327.

Stewart and Stewart, (Terence P. Stewart and David Scott Nance), for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Platte B. Moring, III), Craig L. Jackson, of counsel, Attorney–Advisor, Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, for defendant.

Brownstein, Zeidman and Schomer, (Irwin P. Altschuler and David R. Amerine), for defendant-intervenors.

## MEMORANDUM OPINION AND ORDER

CARMAN, Judge:

In this action PPG Industries, Inc. (PPG) contests certain aspects of the determination of the International Trade Administration, United States Department of Commerce (Commerce), in the final administrative review of the countervailing duty order covering fabricated automotive glass from Mexico for the period October 24, 1984 through December 31, 1985. *Fabricated Automotive Glass From Mexico: Final Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 44,652 (December 11, 1986). Commerce determined the total bounty or grant conferred on defendant-intervenors Vitro Flex, S.A. and Cristales Inastillables De Mexico, S.A.[1] in calendar year 1984 was 2.45% *ad valorem* and

---

1. Throughout this opinion defendant-intervenors will be referred to individually as "Vitro Flex" or "Crinamex," and collectively as "defendant-intervenors."

0.17% *ad valorem* in 1985. *Id.* Commerce determined the benefit received in 1985 was *de minimis* and directed the Customs Service to waive the assessment of countervailing duties for all entries made during 1985 and to waive cash deposit of estimated countervailing duties on future shipments of merchandise. *Id.* at 44,655. PPG contests this determination and moves for judgment upon the administrative record under USCIT Rule 56.1. This Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i) (1982 & Supp. V 1987) and 28 U.S.C. § 1581(c) (1982).

After examination of the contentions of the parties, the statutes, case law and record as discussed below, the Court determines to remand this action to Commerce for the limited purpose of reexamining the benefits conferred by the FOMEX export loans for 1984 and 1985 and to make any appropriate adjustments to the total bounty or grant for the relevant period. As to all other issues the Court holds that Commerce's final determination is based upon substantial evidence on the record and is otherwise in accordance with law.

## BACKGROUND

On January 14, 1985 pursuant to section 303 of the Tariff Act of 1930 as amended, 19 U.S.C. § 1303, Commerce published in the Federal Register a final affirmative countervailing duty determination and order finding that bounties or grants were provided to two manufacturers and exporters of fabricated automotive glass[2] from Mexico, Vitro Flex and Crinamex, in the amount of 4.68% *ad valorem*. *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Fabricated Automotive Glass From Mexico*, 50 Fed.Reg. 1,906 (Jan. 14, 1985). This determination was substantially upheld by

this Court in *Vitro Flex, S.A. v. United States*, 13 CIT ——, 714 F.Supp. 1229 (1989).[3]

Subsequently, on August 5, 1985, defendant-intervenors renounced any further participation in the programs determined by Commerce to be countervailable in its final countervailing duty determination. Administrative Record Document (A.R.) 29, Exhibit 7 (522, 523).[4] On February 18, 1986, Commerce published notice of initiation of a countervailing duty administrative review covering fabricated automotive glass from Mexico. 51 Fed.Reg. 5,751. The review covered the period October 24, 1984 through December 31, 1985 and examined 22 programs alleged to be countervailable.

After substantial investigation Commerce published the preliminary results of its countervailing duty administrative review. 51 Fed.Reg. 25,380 (July 14, 1986). Commerce preliminarily determined that the net countervailable benefit conferred on the Mexican manufacturers and exporters, Crinamex and Vitro Flex, was 6.51% *ad valorem* during the period October 24, 1984 through December 31, 1984 and 0.12% *ad valorem* during calendar year 1985. *Id.*

Prior to the issuance of the final results of the administrative review, Commerce received comments from interested parties and conducted a hearing at PPG's request. A.R. 65 (1175), 59 (712), 61 (827). On the basis of these and other comments and further investigation, Commerce revised its preliminary determination and concluded that the total net bounty or grant received by defendant-intervenors in 1984 was 2.45% *ad valorem* and 0.17% *ad valorem* for the 1985 calendar year and that the latter figure was *de minimis*. 51 Fed.Reg. 44,652. The total benefit was determined to derive

---

**2.** Fabricated automotive glass, referred to hereinafter as "autoglass," is laminated glass made of a clear or tinted piece of plastic sandwiched between two sheets of float glass. Autoglass is frequently used for automobile windshields and sometimes used for rear and side automobile windows.

**3.** In *Vitro Flex,* the Court remanded for the limited purpose of recalculating certain pro-

gram benefits. The parties subsequently consented to dismiss the case upon agreement that the issue on remand had become moot due to the issuance of the final results of the administrative review at issue in this case. *See Vitro Flex, S.A. et al. v. United States,* No. 85–02–00198 (Order dated June 15, 1989).

**4.** The numbers in the parentheses correspond to the microfilm frame numbers of the record.

entirely from defendant-intervenors' participation in the FOMEX program. PPG seeks review of this determination.

PPG asserts four broad arguments in support of its contention that Commerce's final administrative review determination substantially undervalued the countervailable benefit conferred upon defendant-intervenors: (1) Commerce failed to properly calculate the benefit conferred by the FOMEX program;[5] (2) Commerce improperly determined that the FICORCA program[6] was not countervailable; (3) Commerce improperly determined that Mexico's policy concerning the pricing of natural gas was not countervailable, and; (4) Commerce failed to adequately investigate whether benefits were conferred by the CEDI program.[7] PPG asserts Commerce's conclusions were not supported by substantial evidence on the record and were otherwise contrary to law.

In response, Commerce admits to committing certain errors in calculating a portion of the benefit conferred by the FOMEX program and requests a limited remand to make appropriate corrections and perform any necessary recalculations of the total bounty or grant. As to the remaining contentions, Commerce requests they be rejected and the remaining portions of the final determination be upheld based upon substantial evidence on the record. Defendant-intervenors assert the final determination should be sustained in its entirety, arguing that a remand is not necessary.

## DISCUSSION

Commerce's determination must be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(A) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)).

As a general rule this Court will accord substantial deference to Commerce's implementation of its statutory mandate, since an agency's interpretation of a statute it is authorized to administer will be upheld as in accordance with law " 'unless unreasonable and plainly inconsistent with the statute, and ... unless weighty reasons require otherwise.' " *ICC Indus. v. United States*, 5 Fed. Cir. (T) 78, 84, 812 F.2d 694, 699 (1987) (quoting *Melamine Chemicals, Inc. v. United States*, 2 Fed. Cir. (T) 57, 60–61, 732 F.2d 924, 928 (1984)). Furthermore, "[a]n agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.' " *Id.* 5 Fed. Cir. (T) at 85, 812 F.2d at 699 (quoting *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.*, 3 Fed. Cir (T) 83, 90, 753 F.2d 1033, 1039 (1985)) (emphasis in original). Where there is substantial evidence on the record, and conflicting conclusions can be drawn therefrom, this Court will defer to the judgment of the agency, even if the agency's decision is not in accord with the decision the court would have adopted had it reviewed the record *de novo*. *American Lamb Co. v. United States*, 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986).

## I. FOMEX Program

PPG contends that Commerce failed to calculate the full benefit provided to Mexi-

5. FOMEX (Fund for the Promotion of Exports of Mexican Manufactured Products) is a government trust that provides low interest loans at preferential, non-commercial rates, to Mexican companies to promote the manufacture and sale of export products and to promote product exports.

6. FICORCA (Fund for Coverage of Exchange Risks) is a trust fund established by the Mexican Government and the Bank of Mexico to help

companies refinance foreign debt. Commerce also investigated a program entitled FICORCA II and found that it was not used by the industry. 51 Fed.Reg. at 44,652; A.R. 29 at 4 (497), 47 (668, 674). That determination is not challenged here.

7. CEDI (Certificado de Devolution del Impuesto) are tax rebates for exports.

can autoglass producers by FOMEX loans and improperly allocated the benefits over an arbitrarily chosen time period.

### A. FOMEX Valuation

The FOMEX loan program includes pre-export loans paid out in pesos, and export loans paid out in dollars or other foreign currency. PPG contends Commerce made significant errors in determining the value of both categories of loans.

#### 1. FOMEX Pre–Export Loans

■ In determining whether a countervailable subsidy had been conferred by FOMEX pre-export loans at preferential rates, and the amount of any subsidy, Commerce compared the FOMEX loan interest rate with a benchmark national average interest rate. The benchmark rate purportedly reflected the loan interest rate a Mexican company could have obtained through private channels. In determining the benchmark rate for 1984, Commerce used the effective interest rates published by the Bank of Mexico in the publication *Indicadores Economicos* (I.E.) for that year. 51 Fed.Reg. at 44,653.

Since the Bank of Mexico did not publish I.E. rates for 1985, Commerce calculated the benchmark rate for 1985 by using the Costo Porcentual Promedio (CCP). The CCP, relied on by the Bank of Mexico in calculating the I.E. rates, represented the average cost of funds to a sample of Mexican banks plus a spread to reflect a risk premium. To construct a benchmark rate for 1985, Commerce used the average CCP rate for 1985 and added to it the average spread between the CCP and the I.E. effective rates for the period 1982–84.

Commerce explained the rationale underlying its approach:

The effective I.E. interest rates are based on data received from a sample of companies representing a cross-section of the economy. These effective rates include finance charges, *e.g.*, commissions, fees for opening a line of credit, fees for

credit renewal, prepayment of interest, *compensating balances,* etc., and may also include compounding of interest, since many of the loans included in the Bank's sample have short (2–3 month) terms. Both the nominal and effective I.E. interest rates are weighted averages of the rates reported to the Bank [of Mexico] by the banks and companies in the respective samples.

To determine the effective interest rate benchmark for 1984 peso loans, we used the I.E. effective rates published each month and calculated an average annual effective rate. In 1985, the Bank stopped publishing the I.E. rates. Therefore, we calculated the average spread between the CCP rate and the I.E. effective interest rates for the period 1982 through 1984, the only period for which we have I.E. rates. Our effective interest rate benchmark for 1985 was the sum of this average spread and the average CCP rates for 1985. For the FOMEX pre-export loans, we found no evidence of finance charges of any kind. Since interest on these loans is paid at the end of the term, we consider the nominal preferential rate to be the same as the effective preferential interest rate.

*Id.* (emphasis added).

PPG does not object to Commerce's methodology per se, but contends that Commerce understated the benefit conferred by pre-export peso denominated loans by assuming that compensating balances [8] were accounted for in the I.E. interest rates, upon which Commerce based its benchmark rates. Plaintiff's Memorandum In Support of Motion For Judgment on the Agency Record (Plaintiff's Brief) at 17.

The parties agree that "compensating balances are the general practice in Mexico for both commercial and government program loans." A.R. 47 at 2 (657). Compensating balances can allegedly reach as high as 25% of the loan value. *See* Plaintiff's Brief at 8–9; A.R. 59 at 12–13 (723–24).

---

**8.** Compensating balances are essentially funds held by a bank as security for a loan. Many banks require that a borrower maintain an average account balance equal to a percentage of the outstanding loan. Compensating balances have the effect of raising the real or effective interest rate of the loan. *See* Transcript (Tr.) of oral argument at 53 (Aug. 9, 1989); A.R. 17 (270–71).

Since the costs associated with compensating balances tend to drive up the effective cost of short-term borrowing, PPG argues, failure to accurately account for the effect of compensating balances in the benchmark rate resulted in undervaluation of the subsidy conferred by the preferential FOMEX loan rates. PPG challenges whether there is substantial evidence on the record indicating that the I.E. tables relied upon by Commerce in calculating the benchmark interest rate reflected the effect of compensating balances.

In support of its position PPG points to the I.E. table of effective interest rates published in November 1983, which states in footnote one that compensating balances were not considered in creating the I.E. interest rates. A.R. 17 (267, 269) (Table I–21 n. 1). PPG contrasts this statement with a footnote in an I.E. compilation dated October 1984, which noted that the effective interest rates listed for that year included certain costs borne by the lender such as charges for opening, renewal or discount or payment of interest in advance, etc., but failed to mention compensating balances as one of the costs. A.R. 17 (263, 266) (Table I–22 n. 4). PPG further noted at oral argument that the effective interest rates quoted in the two tables overlap for approximately nineteen months (January 1982 through September 1983) and are virtually identical. Tr. at 7; *Compare* A.R. 17, Table I–21 (267, 269) with A.R. 17, Table I–22 (263, 266). PPG argues these documents imply that the 1984 I.E. interest rates Commerce used for its benchmark did not include compensating balances and thus failed to accurately reflect the benefits conferred by the program.

Commerce argues there is ample evidence on the record to support its contention that compensating balances were accounted for by the Bank of Mexico in its I.E. rates and that the benchmark loan rate

Commerce used for comparison was a reasonable one. Defendant's Memorandum In Opposition To Plaintiff's Motion For Judgment Upon The Agency Record (Defendant's Brief) at 48–50.

Commerce contends that the explicit exclusion of compensating balances from the November 1983 table of I.E. rates merely underscores the premise that the I.E. rates normally include compensating balances. *Id.* at 51. In Commerce's words: "Since compensating balances are a common feature in loan transactions in Mexico, any description of charges provided by the Mexican government in its listing of interest rates would no doubt mention the exclusion of compensating balances if they were not considered in compiling the statistics." *Id.; see also* Tr. at 54–55.

In support of its position that I.E. rates included the effect of compensating balances, Commerce relied upon a statement by a Bank of Mexico official from the verification report in *Litharge, Red Lead, and Lead Stabilizers From Mexico*, 51 Fed. Reg. 37,319 (Oct. 21, 1986) (final).[9] The verification report stated: "The spread between the nominal and effective interest rates is due to finance charges ("cargos financieros"), such as commissions, fees for opening a line of credit, fees for credit renewal, and prepayment of interest. *The finance charges may also include compensating balances.*" Remand R., Exhibit 1 at 17 (emphasis added). Commerce argues that the word "may" in the above statement should not be interpreted to mean that the Bank of Mexico official was unsure whether compensating balances were included in calculations of the I.E. rates. Rather, Commerce contends that compensating balances were included in the Bank of Mexico's compilation of the I.E. rates when the underlying survey data included them. Tr. at 55; Remand R. at 3–4.

---

**9.** Since the verification report from *Litharge, Red Lead, and Lead Stabilizers From Mexico*, 51 Fed.Reg. 37,319 was not part of the administrative record in this case Commerce, contemporaneously with the filing of its brief, moved to supplement the administrative record with the document. In a published opinion, this Court remanded the matter to Commerce to supple-

ment the record with direction that interested parties be afforded the opportunity to comment upon the supplemental information Commerce relied on. *See PPG Indus. v. United States*, 13 CIT ——, 708 F.Supp. 1327 (1989). The record on remand will be cited in this opinion as "Remand R."

That is, to the extent that the cross-section of the banks surveyed required compensating balances in their lending practices, the I.E. rates accounted for them. Remand R. at 3–5.

Defendant-intervenors support Commerce's position but add the contention that even if the effect of compensating balances was not included in I.E. rates, Commerce's methodology was reasonable. Brief Of Defendant–Intervenors Vitro Flex, S.A. And Cristales Inastillables De Mexico, S.A. In Opposition To Plaintiff's Motion For Judgment On The Agency Record (Defendant–Intervenors' Brief) at 18.

The Court holds there is substantial evidence on the record to support Commerce's determination that the I.E. rates included an accommodation for the effect of compensating balances. The record reflects that the I.E. rates measured *average* effective interest rates on short term loans, and were compiled through a survey of a cross-section of Mexican loan transactions. Remand R. at 5–7. Loan terms varied from bank to bank and loan to loan. Compensating balances were not required for all loans; they were merely one of many charges that might have been added to the nominal interest rate to increase the total cost of the loan. The excerpt from the verification report in *Litharge, Red Lead and Lead Stabilizers From Mexico,* now a part of the record in this case, fully supports Commerce's determination that the I.E. rates utilized by Commerce for its effective interest rate benchmark for pre-export loans adequately accounted for compensating balances. *See* Remand R., Exhibit 1.[10]

### 2. FOMEX Export Loans

■ PPG also claims Commerce incorrectly calculated the benefit arising from

FOMEX export loans denominated in United States dollars.

In its final administrative review determination, Commerce stated that it lacked sufficient information to calculate an effective interest rate benchmark for 1984, and was compelled to rely upon the nominal interest rate for short-term loans in the United States. *See* 51 Fed.Reg. at 44,653. PPG argues that Commerce had enough evidence in the record to calculate the effective 1984 interest rate for its FOMEX export loan benchmark, and that it was error for Commerce to use nominal rates. Plaintiff's Brief at 17.

For calculations concerning 1985 FOMEX export loans, Commerce used the quarterly weighted average effective interest rates published by the Federal Reserve as its benchmark. Commerce noted that the effective interest rates reflected the terms of the loans plus the nominal interest rate. *See* 51 Fed.Reg. at 44,653.

PPG argues that Commerce failed to include anything in the record that would explain how the Federal Reserve effective rates for 1985 had been compiled. In particular, PPG questions whether the Federal Reserve effective rates, utilized by Commerce in constructing its benchmark rate, accounted for compensating balances.

Defendant-intervenors argue that there is substantial evidence on the record to support Commerce's determination as to the rates for both years.

In its response, Commerce originally agreed with both of PPG's arguments and requested a remand so that it could "ascertain which finance charges, if any, are included in the benchmark dollar interest rates for the years 1984 and 1985." Defendant's Brief at 53. Commerce agreed that within the context of a remand it could ascertain the effective interest rates for

---

**10.** In its Reply Brief, PPG for the first time raised the argument that Commerce was required to verify the information in *Litharge, Red Lead,* concerning the I.E. rates. The Court disagrees. Commerce need only verify information in a section 751 review upon *timely* request by an interested party. 19 U.S.C. § 1677e(b) (1982). PPG's request for verification, after the remand proceedings had concluded, was not

timely. *Carlisle Tire & Rubber Co. v. United States,* 9 CIT 520, 531, 622 F.Supp. 1071, 1081 (1985) (in a final dumping determination it was not unreasonable for Commerce to decline to undertake a second on-site verification upon receipt of submissions subsequent to verification but less than two months before the final determination).

the 1984 export loan benchmark and that utilizing effective rates over nominal rates would be desirable. Tr. at 56; *see also* Remand R. at 3.

In support of its request for a remand to reexamine the 1985 benchmark rate, Commerce indicated it harbored some uncertainty as to which finance charges were included in the quarterly weighted average interest rates published in the Federal Reserve Bulletin. Defendant's Brief at 53–54. However, at oral argument, Commerce took the position that a remand was only appropriate on the issue of the 1984 FOMEX export benchmark rates. Commerce contended that the 1985 benchmark rate did indeed account for the effect of compensating balances and was supported by substantial evidence on the record. Tr. at 56–57.

The Court agrees that a remand is appropriate to allow Commerce to determine an effective interest rate for its benchmark for 1984 FOMEX export loans, and to recalculate the actual amount of the benefit conferred upon defendant-intervenors.

Additionally, the Court directs that on remand Commerce reexamine the 1985 benchmark rate to ascertain which finance charges, if any, were included in the quarterly weighted average interest rates Commerce relied upon in compiling its benchmark. Further, Commerce is directed to examine whether or not the Federal Reserve effective rates used by Commerce in constructing its benchmark rate, accounted for compensating balances and what effect that factor had upon its determination.

### B. FOMEX Allocation

■ PPG contests the methodology by which Commerce allocated the total FOMEX benefits received over the period of the review.

To calculate the *ad valorem* amount of duty to be assessed to offset defendant-intervenors' receipt of subsidies, Commerce determined the total adjusted benefit of the loans and divided this amount by the total exports to the United States over the period of review. A.R. 49 at 2 (691). Commerce chose to allocate the benefits provid-

ed by the FOMEX loan program over the period of review on a calendar year basis. Commerce determined the total net bounty or grant received by the defendant-intervenors for exports of autoglass to the United States from October 24, 1984 to December 31, 1984 was 2.45% *ad valorem.* Similarly, Commerce allocated the entire benefits received by the exporters over the 1985 calendar year, and determined the subsidy to be 0.17% *ad valorem* for 1985. Commerce found the 1985 figure to be *de minimis* and therefore assessed no countervailing duties for that year. 51 Fed.Reg. 44,-652.

PPG argues that under the circumstances of this case it was an abuse of discretion and contrary to the underlying purpose of the countervailing duty statutes for Commerce to allocate the net FOMEX benefits received by defendant-intervenors on the basis of calendar years. Plaintiff's Brief at 21 (citing *Freeport Minerals Co. v. United States,* 4 Fed.Cir. (T) 16, 776 F.2d 1029 (1985)).

PPG expresses concern that defendant-intervenors received preferential FOMEX loan subsidies throughout the first three months of 1985, prior to their February 7, 1985 renunciation, for which no countervailing duties were assessed. Since defendant-intervenors actually received more than *de minimis* benefits prior to their renunciation of FOMEX loans, PPG argues, Commerce's allocation of the FOMEX benefits across the entire 1985 calendar year, in light of the lack of any subsidy for the last three quarters of the year, resulted in the actual subsidy being rendered *de minimis* by Commerce's methodology. In other words, "but-for" Commerce's choice of the calendar year as the basis for allocation of the 1985 FOMEX benefits there would have been no *de minimis* finding and defendant-intervenors would have been assessed duties equal to the benefits they received in accordance with the purpose of the statute.

PPG argues that "[Commerce] was required to allocate the benefit from FOMEX loans over the period in which those loans had an economic effect ..." and that Com-

merce must choose an allocation methodology that is reasonably calculated to reflect the commercial and competitive economic benefit of a subsidy to its recipient. Plaintiff's Brief at 22–23. PPG contends that the economic benefit of the FOMEX loans received by defendant-intervenors ended on March 31, 1985, when all outstanding loans were apparently repaid and program participation terminated. *Id.* at 23. PPG would have Commerce allocate the benefit from FOMEX loans over two periods; one from October 24, 1984 through March 31, 1985, the other from April 1, 1985 through December 31, 1985. Plaintiff's Brief at 13.

In support of its position PPG relies on *IPSCO, Inc. v. United States*, 12 CIT ——, 687 F.Supp. 614 (1988) and *British Steel Corp. v. United States*, 10 CIT 224, 632 F.Supp. 59 (1986) as well as the legislative history discussed in those cases. Plaintiff's Brief at 22–23.

PPG also seeks support in Commerce's administrative practices and precedents, which PPG argues, mandate the use of a different allocation methodology by Commerce when program-wide changes occur within the period under review. Defendant-intervenors' renunciation of FOMEX benefits early in 1985, PPG argues, was equivalent to a program-wide change that required Commerce to adopt a non-calendar year allocation methodology to ensure that the countervailing duty imposed accurately reflected the actual level of subsidization. PPG also looks for support in administrative determinations where Commerce altered its standard allocation procedures to account for certain unique and anomalous factual circumstances. Plaintiff's Brief at 24–26 (citing *Oil Country Tubular Goods From Israel*, 51 Fed.Reg. 21,201 (1986); *Cast–Iron Pipe Fittings From Brazil*, 50 Fed.Reg. 8,755 (1985); *Rice From Thailand*, 51 Fed.Reg. 3,377 (1986); *Ceramic Tile From Mexico*, 49 Fed.Reg. 9,919 (1984); *Sugar Contents of Certain Articles From Australia*, 50 Fed.Reg. 27,330 (1985) (preliminary determination); *Offshore Platform Jackets and Piles From The Republic of Korea*, 51 Fed.Reg. 11,799 (1986); *Certain Steel Products From*

*South Africa*, 47 Fed.Reg. 39,379 (1982); *Carbon Steel Wire Rod From South Africa*, 47 Fed.Reg. 42,396 (1982)).

Commerce responds that it exercised its discretion in a reasonable fashion, consistent with administrative practice and precedents and not contrary to law. In its final determination Commerce presented the following rationale for its refusal to adopt an allocation period other than the calendar year in this case:

At the outset of this review, we clearly identified the time period for the review in our questionnaire. Furthermore, the calendar year coincides with the fiscal year of the two companies involved. Adjusting the period of review as the petitioners suggest, with no compelling reason, would set a precedent by which either party could arbitrarily manipulate the time period set for a review in order best to serve its own interests. One could spread a given benefit over a long enough period of time to obtain a *de minimis* rate. Likewise, one could take a given benefit and sufficiently limit the time period to obtain an excessive rate. Such a precedent would severely undermine the Department's policy, particularly the *de minimis* standard.

51 Fed.Reg. at 44,654. Commerce also distinguished the primary cases and administrative decisions relied upon by PPG. *Id.*

In its brief and at oral argument, Commerce emphasized the argument that PPG had failed to raise compelling reasons in favor of adoption of a different allocation period in this case. Commerce noted its apprehension that use of periods inconsistent with calendar or fiscal years would greatly hamper the collection of information during investigations. Commerce expressed concern that parties to an investigation not be given the opportunity to "gerrymander" the allocation period, opining that the purpose of the *de minimis* rule would be undermined by such a practice.

In addition to concurring in the above arguments, defendant-intervenors interject the so-called "slippery slope" argument,

postulating that allowing the allocation period to be determined on a case by case basis would be unworkable, not susceptible of precise standards and unnecessarily open the door to arguments of zealous counsel eager to slant allocation periods to their client's advantage. Defendant–Intervenors' Brief at 29–30.

After careful examination of the record of this case, the case precedents and the arguments of the parties, the Court determines that Commerce's allocation of FO-MEX benefits over the calendar year was a reasonable exercise of its discretion, not inconsistent with statutory mandates or agency practice. Here, the choice of allocation methodology was within the sound discretion of Commerce and PPG has failed to show Commerce's choice was unreasonable or unsupported by substantial evidence on the record or otherwise not in accordance with law. PPG's quarrel amounts to little more than the argument that the allocation methodology it suggests is more reasonable than Commerce's. As noted on numerous occasions, this argument cannot prevail. *See e.g. Matsushita Elec. Indus. Co. v. United States*, 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984).

As courts have stated time and time again, an agency has broad latitude to implement the statutory scheme it is charged with administering. When reviewing an exercise of agency discretion in an area where the statute is silent, a reviewing court will not disturb an agency's interpretation of the statute provided the interpretation is reasonable, in accordance with law and not contrary to expressed Congressional intent. *Corning Glass Works v. United States Int'l Trade Comm'n,* 4 Fed.Cir. (T) 118, 121–22, 799 F.2d 1559, 1565 (1986); *cf. Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 n. 9 (Fed.Cir.1990) (citing *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). Importantly, the chosen methodology need not be the most reasonable though it must " 'reasonably [and] accurately reflect factual information in the administrative record.' " *IPSCO, Inc. v. United States*, 12 CIT ——, 701 F.Supp. 236, 238 (1988) (quoting *British Steel*, 10 CIT at 235, 632 F.Supp. at 68).

Section 751, of the Tariff Act of 1930 as amended, providing for administrative review determinations, by its silence, leaves conduct of the reviews within the discretion of the administering agency. *See* 19 U.S.C. § 1675 (1982 & Supp. V 1987). Frequently, the period of review begins on the first day of the calendar year and ends on the last day of that same year. Because this review was the first administrative review of the countervailing duty order, the period of review began on the date the preliminary determination was published in the Federal Register and continued to the end of the next calendar year.[11]

In countervailing duty determinations Commerce has consistently allocated short term loans, and benefits generally, by calendar or fiscal year.[12] The same has been true for administrative reviews, even when the review period encompasses more than twelve months.[13] Commerce has also employed this methodology when evaluating

**11.** The initial date of the review period in the first administrative review usually coincides with the date of the preliminary affirmative determination because it is the first date on which Commerce is authorized by statute to order the suspension of liquidation of merchandise subject to countervailing duties. *See* 19 U.S.C. § 1671b(d) (1982).

**12.** *See, e.g., Final Affirmative Countervailing Duty Determination; Certain Fresh Cut Flowers From Israel,* 52 Fed.Reg. 3,316 (Feb. 3, 1987); *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Certain Steel Wire Nails From Thailand,* 52 Fed.Reg.

36,987 (Oct. 2, 1987); *Final Affirmative Countervailing Duty Determination; Certain Electrical Conductor Aluminum Redraw Rod From Venezuela,* 53 Fed.Reg. 24,763 (June 30, 1988).

**13.** *See, e.g., Certain Tool Steel Products From Brazil; Preliminary Results of Countervailing Duty Administrative Review,* 51 Fed.Reg. 39,697 (Oct. 30, 1986); *Certain Apparel From Argentina; Final Results of Countervailing Duty Administrative Review,* 53 Fed.Reg. 1,053 (Jan. 15, 1988); *Steel Wire From New Zealand; Final Results of Countervailing Duty Administrative Review,* 53 Fed.Reg. 42,993 (Oct. 25, 1988).

FOMEX loans in other determinations.[14] Commerce has never given parties the power to arbitrarily set the allocation periods. Rather, as the administrative determinations cited by PPG show, Commerce has considered alternative methodologies when supported by compelling arguments grounded in the facts of the case under review, when application would further the underlying purposes of the statutory scheme. Unlike the cases and administrative determinations relied upon by PPG, the facts of this case do not present a compelling argument for similar treatment.

PPG relies upon *British Steel* and *IP-SCO* in support of its claim that Commerce's choice of allocation period was unreasonable in that the calendar year accounting does not reasonably reflect the commercial and competitive benefit to the recipient of the subsidies over time. Commerce argues that these cases are inapposite because they concerned benefits received to purchase long-term capital assets used in the manufacture and production of steel products whereas this case concerns short-term loans.

At issue in *British Steel* was Commerce's use of a 15–year allocation period for certain equity infusions from the British government to the British Steel Corporation. The choice of the 15–year allocation period derived from Commerce's reliance on the so-called "Subsidies Appendix" in *Cold–Rolled Carbon Steel Flat–Rolled Products From Argentina,* 49 Fed. Reg. 18,006, 18,016 (Apr. 26, 1984) (final). 10 CIT at 233, 632 F.Supp. at 67. Commerce openly noted that its choice of the 15–year period was arbitrary, but argued that the procedures outlined in the Subsidies Appendix reasonably reflected the commercial and competitive effect of the benefit of the subsidy. 10 CIT at 234, 632 F.Supp. at 67. Commerce also argued that administrative considerations favoring pre-

dictability and consistency in agency determinations supported its position. *Id.*

In rejecting Commerce's position, the Court noted that the monies at issue in *British Steel,* funds used to cover operating costs, to defray operating losses, and to cover redundancy and closure costs, made British Steel more efficient and competitive, the effect of which continued beyond the year of receipt into subsequent accounting periods. 10 CIT at 237, 632 F.Supp. at 69. The Court concluded that

linking the commercial and competitive benefit of the subsidies at issue to the 15–year average useful life of capital assets in the U.S. steel industry, while administratively convenient, is unreasonable and not in accordance with Congressional intent that the benefits be allocated over a period of time reflecting *the commercial and competitive benefit of the subsidy to the recipient.*

10 CIT at 236, 632 F.Supp. at 68 (emphasis in original). The Court remanded the case to Commerce, requiring the agency to use an allocation methodology reasonably responsive to the facts of the case.

In reaching its holding the Court relied upon the legislative history of the Trade Agreements Act of 1979, the pertinent portion of which provides as follows:

There is a special problem in determining the gross subsidy with respect to a product in the case of *nonrecurring subsidy grants or loans, such as those which aid an enterprise in acquiring capital equipment or a plant.* Reasonable methods of allocating the value of such subsidies over the production or exportation of the products benefitting from the subsidy must be used. *In particular, a reasonable period based on the commercial and competitive benefit to the recipient as a result of the subsidy must be used.* For example, allocating a subsidy in equal increments over the anticipated 20–year useful life of cap-

---

**14.** *See e.g., Ceramic Tile From Mexico; Final Results of Countervailing Duty Administrative Review,* 53 Fed.Reg. 15,090 (April 27, 1988); *Certain Iron–Metal Castings From Mexico; Final Results of Countervailing Duty Administrative Review,* 54 Fed.Reg. 3,632 (Jan. 25, 1989); *Bricks From Mexico; Final Results of Countervailing Duty Administrative Review,* 53 Fed.Reg. 38,314 (Sept. 30, 1988); *Carbon Black From Mexico; Preliminary Results of Countervailing Duty Administrative Review,* 53 Fed.Reg. 15,087 (Apr. 27, 1988).

ital equipment purchased with the aid of the subsidy would not be reasonable if the capital equipment gave the recipient of the subsidy an immediate significant competitive benefit compared to what would be the situation without the capital equipment and compared to the competitive benefit the equipment would likely provide in the later stages of its useful life.

S.Rep. No. 249, 96th Cong., 1st Sess. 85–86, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 471–72 (emphasis added).

Similarly, the Court in *IPSCO* rejected Commerce's admittedly arbitrary choice of a 15–year allocation period for the value of grants received by IPSCO for capital improvement of its steel facilities. As in *British Steel*, the *IPSCO* Court, relying on the above-quoted legislative history, concluded that Commerce's reliance upon the 15–year period in the same Subsidies Appendix was not reasonably related to a determination of the commercial and competitive benefit of the subsidy to IPSCO. 12 CIT at ——, 687 F.Supp. at 625.[15]

Rejecting Commerce's arguments that policies favoring consistency and predictability in agency decision-making were sufficient reasons to uphold Commerce's reliance on the 15–year allocation period in the Subsidies Appendix, the Court stated "[s]imply applying a standard method, in the name of consistency and predictability, does not ensure the reasonableness of either the method, or the resulting period, in this or any other particular case." *Id.* The Court noted that absent a properly promulgated rule governing Commerce's selection of allocation periods, Commerce must provide a nonarbitrary basis for its reliance on the methodology in the Subsidies Appendix, based on the facts of the case before it. 12 CIT at ——, 687 F.Supp. at 626 (citing *Carlisle Tire & Rubber Co. v. United States*, 10 CIT 301, 306, 634 F.Supp. 419, 423 (1986)); *and see British Steel*, 10 CIT at 235, 632 F.Supp. at 68 (citing *Alhambra Foundry v. United*

*States*, 9 CIT 632, 636, 626 F.Supp. 402, 408 (1985).

This Court finds *British Steel* and *IPSCO* distinguishable from the case at bar.

*British Steel* concerned long-term equity infusions from the British Government to British Steel Corporation aimed at enabling the company to complete long-term restructuring, avoid bankruptcy and become more competitive. *British Steel*, 10 CIT at 237, 632 F.Supp. at 69. The Court noted the British Government's equity infusions provided the British Steel Corp. with a benefit "beyond the year of receipt and into subsequent accounting periods." *British Steel*, 10 CIT at 237, 632 F.Supp. at 69.

*IPSCO* involved long-term benefits in the form of subsidies used for the purchase of capital equipment. *IPSCO*, 12 CIT at ——, 687 F.Supp. at 620.

Neither *British Steel* nor *IPSCO* addressed the reasonableness of Commerce's choice of allocation period in the context of *short-term* subsidies, as is the case at bar, where the loans had terms of 60 to 90 days and were tied to individual shipments of export merchandise. A.R. 49 at 3 (658); A.R. 29, Exhibit 3 (510).

PPG's claim rests upon the speculative assumption that the commercial and competitive benefit to defendant-intervenors from the FOMEX loans ceased as of March 31, 1985. Plaintiff's Brief at 23. Commerce made no such determination. Rather, Commerce impliedly determined the benefits from the subsidies accrued over the entire calendar (and fiscal) year upon which Vitro Flex and Crinamex based their accounting. A.R. 29 at 3 (496). The Court does not find it unreasonable for Commerce to treat the FOMEX loan subsidies, received in the first quarter of 1985, as having a beneficial effect on the competitive posture of Vitro Flex and Crinamex for the remainder of the fiscal year—in this case the 1985 calendar year.

The Court also agrees with Commerce that PPG has failed to raise a compelling

---

**15.** The Court of Appeals for the Federal Circuit recently upheld Commerce's determination to use a 21–year period over which to amortize the grants to IPSCO. *IPSCO, Inc. v. United States,* 899 F.2d 1192 (Fed.Cir.1990).

argument why this approach fails to reflect the commercial and competitive effect of the benefits to defendant-intervenors. Absent a compelling argument in fact or law that Commerce's choice of methodology was unreasonable, without support on the record, or an abuse of its discretion, this Court must uphold the agency.

The Court has examined the administrative determinations relied upon by PPG and found them unpersuasive.[16] In those determinations Commerce altered its allocation methodology due to program-wide changes that occurred during the period under administrative review (such as a change in benefits or the program's suspension), or for other unusual circumstances having no application to this case. Defendant-intervenors' voluntary renunciation of the FOMEX benefits in this case did nothing to change the program or its availability, nor did the renunciation of benefits constitute a special circumstance. Instead, defendant-intervenors' renunciation would appear to be a manifestation of the success of the countervailing duty laws in encouraging specific industries or groups of industries to forego unfair subsidies and compete on equal footing in the international arena.

Here, the choice of allocation methodology was clearly reposed in Commerce and Commerce exercised its discretion reasonably. The Court holds there is substantial evidence on the record to uphold Commerce's determination to allocate FOMEX benefits on a calendar year basis.

## II. FICORCA Program

In its final administrative review, Commerce determined not to investigate the FICORCA program[17] because it had previously found the program not countervailable in the final determination on float glass from Mexico, *Unprocessed Float Glass From Mexico; Countervailing Duty Determination,* 49 Fed.Reg. 23,097 (June 4,

1984) (final) (hereinafter "float glass determination"), and because PPG had failed to submit any new information warranting another investigation. 51 Fed.Reg. at 44,653. Commerce reiterated its conclusion in the final float glass determination that the FICORCA program was not provided to a specific enterprise or industry, or group of enterprises or industries, and that the program was not countervailable. *Id.*

Subsequently, this Court affirmed Commerce's final float glass determination in its entirety, including Commerce's determination that FICORCA was not countervailable. *PPG II,* 11 CIT at 354, 662 F.Supp. at 266. After an exhaustive examination of the issue, this Court stated in *PPG II* that Commerce "reasonably determined pursuant to its statutory mandate that FICORCA benefits are not countervailable since they do not provide a benefit to a specific enterprise or industry, or group of enterprises or industries." *Id.* In reaching this conclusion, the Court thoroughly analyzed and rejected PPG's argument that Commerce improperly relied upon the so-called general availability test found unlawful in *Cabot Corp. v. United States,* 9 CIT 489, 620 F.Supp. 722 (1985) (*Cabot I*), appeal dismissed, 4 Fed.Cir. (T) 80, 788 F.2d 1539 (1986). The Court found the eligibility requirements for participation in FICORCA did not render the program beneficial to a discrete class of beneficiaries. *PPG II,* 11 CIT at 353, 662 F.Supp. at 266.

PPG challenges Commerce's determination not to investigate the FICORCA program claiming the determination is not supported by substantial evidence on the record and is not in accordance with law. PPG contends Commerce improperly employed the general availability test in reaching its determination and argues that Commerce violated its statutory duty by failing to obtain sufficient information necessary to make its determination. Addi-

---

16. PPG itself admits that the administrative determinations it relies upon are not directly on point, suggesting instead that they are persuasive by analogy. Reply Brief of Plaintiff PPG Industries, Inc. (Plaintiff's Reply Brief) at 32; Tr. at 32.

17. The FICORCA program is more fully explained in *PPG Industries, Inc. v. United States,* 11 CIT 344, 349, 662 F.Supp. 258, 263–64 (1987) (*PPG II*), appeal pending, No. 88–1175 (Fed.Cir. Dec. 28, 1987).

tionally, PPG suggests that Commerce violated a duty to "explain to PPG why the information submitted by PPG was inadequate to trigger a further investigation of FICORCA by the agency [and] ... describe what sort of information it would need." Plaintiff's Brief at 49 (citing *Far East Machinery Co., Ltd. v. United States,* 12 CIT ——, 688 F.Supp. 610 (1988)).

Commerce initially responded by invoking the doctrine of issue preclusion in general (collateral estoppel in particular) as a bar to PPG's claim, but withdrew the claim at oral argument. Tr. at 42. However, since defendant-intervenors also raised the collateral estoppel issue, the Court will address it.[18] Additionally, Commerce claims this Court is bound by the doctrine of *stare decisis* to apply the same legal principles as were applied in *PPG II* to the issue of FICORCA countervailability. Lastly, Commerce asserts that it properly refused to investigate the FICORCA program because it had been determined to be not countervailable in the prior final float glass determination and PPG had presented no new information to justify its reexamination. Defendant-intervenors generally support these contentions, adding that Commerce's determination that FICORCA is not a countervailable bounty or grant is supported by substantial evidence on the record and is otherwise in accordance with law.

*A. Issue Preclusion*

■ The Court of Appeals for the Federal Circuit has stated that questions of issue preclusion should be guided by the *Restatement (Second) of Judgments,* which defines issue preclusion as a species of the broad category *res judicata. Young Engineers, Inc. v. United States Int'l Trade Comm'n,* 2 Fed.Cir. (T) 9, 19, 721 F.2d 1305, 1314 (1983). The Court stated: " 'issue preclusion [concerns] the effect of [a] determination of an issue in another action between the parties on the same claim (direct estoppel) or a different claim (collateral estoppel).' " *Id.* (quoting *Restatement*

*(Second) of Judgments,* § 13 (1982) (introductory note)); *see also Cabot Corp. v. United States,* 12 CIT ——, 694 F.Supp. 949, 953 n. 5 (1988) (*Cabot II* ); *PPG Industries, Inc. v. United States,* 13 CIT ——, 712 F.Supp. 195, 198 (1989) (*PPG III* ), appeal pending, No. 89-1520 (Fed.Cir. June 1, 1989).

The *Restatement* further describes issue preclusion as follows:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

*Restatement (Second) of Judgments,* at § 27 (introductory note); *see also United States v. Mendoza,* 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984).

The following four conditions must be met for issue preclusion to obtain:

(i) the issue previously adjudicated is identical with that now presented,

(ii) that the issue was "actually litigated" in the prior case,

(iii) the previous determination of that issue was necessary to the end-decision then made, and

(iv) the party precluded was fully represented by counsel in the prior action.

*Thomas v. GSA,* 794 F.2d 661, 664 (Fed.Cir. 1986). The parties focus on requirement (i) above concerning the identity of the previously litigated issue to the one currently before the Court.

Defendant-intervenors, and Commerce in its brief, argue that the legal issue in the float glass determination (*PPG II*) and this case are identical. They claim that in both cases PPG raised the contention that Commerce improperly determined that the FICORCA program was not countervailable.

PPG claims that because the two determinations were based upon different facts, principles of issue preclusion do not apply.

---

**18.** Commerce also claimed that PPG was collaterally estopped from raising the question of the countervailability of Mexico's natural gas pricing policy. Since Commerce withdrew its col-

lateral estoppel argument and defendant-intervenors did not raise it concerning PPG's natural gas claims, this Court will not address that issue.

In particular, PPG notes that the final float glass determination was based upon, and examined, different time periods and involved different manufacturers and exporters from the instant investigation. PPG also claims the information it submitted to Commerce during the investigation relating to the FICORCA program raised substantial factual issues distinguishing this case from the float glass determination. PPG also notes that in *PPG II* the Court principally addressed the eligibility requirements of the FICORCA program but did not discuss the application procedures, approval rates, or the actual distribution of benefits. Plaintiff's Reply Brief at 8.

This Court's discussion of a virtually identical collateral estoppel argument in *PPG III* is instructive. There, this Court stated:

> The burden on the party seeking issue preclusion is and should be exacting. This is especially so in trade cases, since Congress has made specific provision for periodic administrative reviews in countervailing duty and dumping cases.... Since the agencies involved perform the function of expert finders of fact concerning different programs, different time frames, economic statistics and other factors in countervailing duty and dumping investigations as well as similar functions during periodic reviews, principles of issue preclusion should be carefully applied. To hold otherwise would have a chilling effect upon the administrative processes envisioned by the Congress.

13 CIT at —, 712 F.Supp. at 199. These considerations apply equally to the case at bar.

On the basis of the facts of this case the Court holds there has not been a showing of sufficient identity between the issues in the float glass determination in *PPG II* and this case for issue preclusion to apply. PPG is not precluded from litigating the issue of FICORCA countervailability in this proceeding.

### B. Sufficiency of Evidence to Justify Reexamination

▮ Turning to the merits, Commerce found that the FICORCA program was not countervailable in the final unprocessed float glass determination and refused to investigate the FICORCA program anew. Commerce submits this determination was reasonable because the evidence PPG submitted during the investigation was not sufficient to justify reexamination of FICORCA. 51 Fed.Reg. at 44,653–54. Commerce argues that it "will not investigate a program alleged to confer a bounty or grant once it has determined, in a final determination, that the same program is not countervailable unless the petitioner alleges new facts or presents new evidence justifying a review of the finding." Defendant's Brief at 27; *see also Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Fabricated Automotive Glass From Mexico*, 50 Fed.Reg. 1,906, 1,909 (Jan. 14, 1985) ("Absent new evidence or change of circumstances, we do not reinvestigate programs found not to be countervailable in earlier investigations.").

PPG argues that Commerce was required to investigate the FICORCA program on the basis of the information it submitted during the review. In this case PPG submitted both "old" information and "new" information. The old information consisted of documents and briefs previously submitted to Commerce in the float glass determination. The new information related to the utilization of the FICORCA program by various companies, none of which had been considered by Commerce in the float glass determination. A.R. 17, Exhibit 3 (363).

PPG claims the new information showed that the Mexican Government pre-selected beneficiaries of the FICORCA program, the eligibility requirements served to limit the availability of the program, and the program provided *de facto* benefits to a discrete class of beneficiaries. PPG argued this conclusion could be inferred from the "fact that the number of participants, though absolutely relatively large (1200), was quite small (3.5%) in relation to the number of all companies in Mexico."

Plaintiff's Reply Brief at 18. PPG also relied on information that purported to show that nine companies accounted for more than 50% of all debt enrolled in the program and that the Vitro group alone accounted for over 8% of FICORCA coverage. *Id.;* Plaintiff's Brief at 44.

Commerce has discretion in deciding whether to reinvestigate a program previously found not countervailable in a final agency determination; in reaching its decision Commerce is entitled to draw upon its own knowledge and expertise and facts capable of judicial notice. *See Can–Am Corp. v. United States,* 11 CIT 424, 429, 664 F.Supp. 1444, 1449 (1987); *cf. United States v. Roses, Inc.,* 1 Fed.Cir. (T) 39, 46, 706 F.2d 1563, 1568–69 (1983) (agency discretion in deciding whether to initiate an antidumping investigation); *cf. Luciano Pisoni Fabbrica Accessori v. United States,* 10 CIT 424, 426, 640 F.Supp. 255, 257 (1986) (same).

The information submitted by PPG was examined by Commerce and found insufficient to justify a new investigation. Commerce asserted the information failed to rebut its prior finding that the program was "not provided to a specific industry, or group of enterprises or industries, and that the program is not countervailable." 51 Fed.Reg. at 44,653.[19] The Court notes that the information submitted by PPG was not materially inconsistent with Commerce's analysis or conclusions in the float glass determination, nor was the information otherwise of such import as to cast grave doubt on the soundness of Commerce's original determination that FICORCA was not countervailable.

On the basis of an examination of the record, the arguments of the parties and the facts of this case, the Court concludes it was reasonable for Commerce to not investigate FICORCA and the Court finds the determination was based upon substantial evidence on the record and was not contrary to law.[20]

## III. Mexican Natural Gas Pricing Policy

PPG challenges Commerce's determination that the producers of autoglass did not receive countervailable benefits in the form of nonmarket rate natural gas prices. Specifically, PPG contends that the Mexican government had implemented a policy of selling natural gas to industrial users in Mexico at prices (1) below the world market price and the Mexican export price of natural gas; and (2) that were preferentially lower for certain industries within Mexico. Plaintiff's Brief at 50. PPG claims Commerce's failure to address these issues in either its preliminary or final determinations was contrary to law and not based upon substantial evidence on the record.

**19.** Contrary to PPG's assertion, the holding and rationale of *Far East Machinery Co., Ltd. v. United States,* 12 CIT ——, 688 F.Supp. 610, do not apply in this case. *Far East Machinery* concerned an administrative review of an antidumping duty order where Commerce had employed several different standards in the same review in determining the validity of a duty drawback adjustment claimed by plaintiff. The Court ruled that Commerce's use of undefined standards failed to put plaintiff on notice of the information it was required to submit to establish the adjustment. Based on the facts of the case, the Court remanded the matter and required Commerce to "make clear exactly what the record must establish in order to substantiate a drawback adjustment." 12 CIT at ——, 688 F.Supp. at 616–17.

*Far East Machinery* does not stand for the proposition, as PPG contends, that Commerce is generally obliged to instruct a party to an administrative review of the information required to trigger reinvestigation of a program. Rather, the Court in *Far East Machinery* was concerned with enforcing consistency in agency application of statutory standards.

PPG has offered no statutory or other authority to support its contention that in cases such as the one at bar, where Commerce's standard of review is clearly articulated, consistently applied and the parties are on notice of its use, Commerce must inform the parties what information would be sufficient to trigger a reexamination of a program previously found not countervailable by the agency in a final determination.

**20.** In view of the Court's decision that it was reasonable for Commerce to refrain from reexamination of the FICORCA program in the absence of sufficient new evidence presented by PPG to justify it, the Court need not address Commerce's argument concerning the application of the doctrine of *stare decisis* to the countervailability of FICORCA as a matter of law.

In response, Commerce notes a distinction between PPG's two claims: the first concerns a "dual pricing policy," the second, a "preferential pricing policy." At oral argument, Commerce articulated the difference:

> By "dual pricing policy," we mean that plaintiff in the past has alleged that the Mexican Government charges one price for natural gas, the natural gas it sends to foreign countries, and a different price for natural gas—for the gas it sells to its domestic industries. That's what we call "dual pricing policy."

The second issue concerns preferential pricing and that is selling some natural gas to companies inside Mexico at different prices or prefer one industry within the domestic economy over the other. That's preferential pricing. . . .

Tr. at 43–44.

Commerce concedes it did not address PPG's dual pricing policy claim but asserts the allegation was not timely raised during the administrative review and thus PPG failed to exhaust its administrative remedies, precluding its claim at this stage of the proceedings. Commerce stated:

> [PPG] did not request that Commerce investigate whether the provision of natural gas to the domestic industry at lower prices than it was sold for export constituted a countervailable subsidy. Instead, it requested Commerce to examine whether Mexico provided price discounts to certain natural gas consumers in Mexico.

Defendant's Brief at 29.

As to the preferential pricing policy, Commerce contends it did investigate the issue exhaustively and determined neither Vitro Flex nor Crinamex received any subsidies. Commerce contends there is substantial evidence on the record to support its determination.[21]

Defendant-intervenors generally concur in Commerce's arguments but highlight the

chronology of PPG's dual pricing argument. Defendant-intervenors note that PPG raised the dual pricing issue in a footnote, without argument or other support, after verification had already been completed and contrary to notification PPG had received from Commerce that no new subsidy allegations would be investigated after verification. Defendant-intervenors' Brief at 60–61; *See* A.R. 44 (643), A.R. 59 at 36 (747).

### A. Dual Pricing Policy

■ In its request for an administrative review PPG sought investigation of alleged preferential pricing between certain Mexican consumers, but declined to pursue the same remedy as to dual pricing. A.R. 17 at 10 (205). PPG's request stated:

> The Government of Mexico has implemented a conscious policy of selling natural gas to domestic users, especially domestic industries, at prices below the world-market price and the price which Mexico charges for its own exports of natural gas. In the past, there have also been price discounts for certain types of industrial users of natural gas, so that these users paid an even lower price for gas. The ITA has determined that a difference between world and domestic prices for natural gas does not in itself confer a countervailable bounty or grant. However, a system of discounting prices for certain consumers would constitute a countervailable preference. The ITA therefore should examine during the review whether such a system of discounting still exists, and if so, the extent to which Respondents have benefitted from it.

*Id.* Commerce claims it did precisely what PPG requested. The Court agrees.

PPG requested Commerce to investigate preferential pricing of natural gas—the provision of natural gas by the Mexican government at preferential prices to certain domestic industries. It did not request

---

**21.** Commerce also raises the issue of *stare decisis* as to PPG's claims concerning the Mexican Government's natural gas pricing policy. The Court will refrain from addressing this issue, since as discussed below, Commerce's determination that the parties to the investigation did not receive preferential prices on natural gas was based upon substantial evidence on the record.

Commerce to investigate the dual pricing of natural gas in the domestic market in relation to the export market. Nevertheless, PPG claims it was not required to exhaust its administrative remedies in regard to the dual pricing issue since it would have been futile in light of repeated determinations by Commerce that Mexico's natural gas pricing policy did not provide a countervailable bounty or grant. Plaintiff's Reply Brief at 12.

As a general rule, the doctrine of exhaustion of administrative remedies provides that "judicial review of administrative action is inappropriate unless and until the person seeking to challenge that action has utilized the prescribed administrative procedures for raising the point." *Sharp Corp. v. United States*, 6 Fed.Cir. (T) 63, 67, 837 F.2d 1058, 1062 (1988); *see also Wieland Werke, AG v. United States*, 13 CIT ——, 718 F.Supp. 50, 55 (1989); *Lowa, Ltd. v. United States*, 5 CIT 81, 90, 561 F.Supp. 441, 448 (1983), *aff'd*, 2 Fed.Cir. (T) 27, 724 F.2d 121 (1984).

Under certain unusual circumstances, such as the futility of pursuing the administrative relief available, failure to exhaust administrative remedies will not preclude judicial review. For example, where the agency has no power to provide the remedy sought, or where the remedy would be manifestly inadequate, or the procedural steps required by the agency would constitute "clearly useless acts," exhaustion can be waived. *See Wieland Werke*, 13 CIT at ——, 718 F.Supp. at 55; *Alhambra Foundry Co., Ltd. v. United States*, 12 CIT at ——, 685 F.Supp. 1252, 1256 (1988); *United States v. Priority Products*, 4 Fed.Cir. (T) 88, 92–93, 793 F.2d 296, 300 (1986); *Luggage and Leather Goods Mfrs. of America v. United States*, 7 CIT 258, 266, 588 F.Supp. 1413, 1420 (1984); *and see generally* 4 K. Davis, Administrative Law Treatise § 26:11 (2d ed. 1983).

The Court does not agree that exhaustion should be waived on the basis of futility. PPG claims that it would have been futile to raise the dual pricing policy issue before the agency in a timely fashion because "the ITA has repeatedly determined that Mexico's natural gas pricing policy does not provide a countervailable bounty or grant." Plaintiff's Reply Brief at 12. The fact that a party to an administrative proceeding finds an argument may lack merit, or had failed to prevail in a prior proceeding based on different facts, does not, without more, rise to the level of futility barring exhaustion. Whatever prejudice that may inure to PPG from this scenario was brought on by PPG's own acts.

As the chronology of PPG's actions in the administrative review makes clear, PPG apparently failed to raise the dual pricing argument in its original request for administrative review because of a tactical decision, not its futility, since subsequently and belatedly, PPG did attempt to raise the dual pricing issue for review. Thus, it was the *untimeliness* of PPG's claim, not that it would have been futile for PPG to raise the issue, that led Commerce to not consider the dual pricing argument. On the basis of these facts, the Court can discern no unusual or extraordinary circumstances to justify PPG's failure to raise the dual pricing issue in a timely fashion before Commerce.

Under the circumstances of this case, the policies underlying the exhaustion doctrine do not support a waiver and Commerce's failure to address the dual pricing issue was reasonable, based upon substantial evidence and was not contrary to law.

## B. Preferential Pricing Policy

■ On December 10, 1985 Commerce sent a questionnaire to the Government of Mexico requesting information concerning any discounts on the price of natural gas defendant-intervenors may have received or that the Mexican Government may have bestowed in general. A.R. 24 at 5 (477). The Mexican Government responded that neither Vitro Flex nor Crinamex received any preferential natural gas discounts during the period under review. A.R. 29 at 4 (497).

During verification, Commerce obtained a copy of the national price list for natural gas from the Mexican Secretary of Finance which contained monthly listings covering

the period of review. A.R. 47 at 10 (665). While visiting the offices of both Crinamex and Vitro Flex during verification, Commerce officials compared information from the official government price list with selected invoices for energy bills from Vitro Flex and Crinamex during the period of review and determined that the prices matched the national list prices and reflected no natural gas discount. *Id.* at 14, 19 (669, 674). Nothing on the record contradicts these findings.

The Court holds there is substantial evidence on the record to uphold Commerce's determination that defendant-intervenors did not obtain natural gas at preferential prices.

## IV. CEDI Program

█ PPG contends Commerce did not adequately investigate whether defendant-intervenors received CEDI program tax rebates. PPG also challenges Commerce's decision not to investigate whether an export consortium and subsidiary of Vitro, S.A., Fomento de Comercio Exterior (FCE), received CEDIs.

During the investigation, PPG submitted certain information to the agency including a copy of the Mexican President's Economic Report for 1985, and annual reports of Vitro S.A. (the parent company of Vitro Flex and Crinamex), both of which, PPG argues, suggested that the CEDI program continued to operate, contrary to the assertions by Commerce and Mexican officials. A.R. 68 (1254–92). PPG argues Commerce was obligated to investigate FCE to determine whether FCE received CEDI tax rebates for exports of autoglass. PPG also suggested that Commerce investigate whether a program called Extra–CEDI conferred benefits on exporters of autoglass.

Notwithstanding PPG's assertions to the contrary, Commerce determined that the CEDI program had been discontinued in 1982 and that FCE had no direct connection with the export of autoglass or any dealings with either of the companies under review.[22] A.R. 29 at 3 (496). During veri-

fication, the Mexican Government denied the existence of the Extra–CEDI program. A.R. 47 at 4 (659).

Commerce also verified that Vitro Flex, Crinamex and FCE had not received CEDI benefits during the period of review. *See* 51 Fed.Reg. at 44,653; A.R. 47 at 16–20 (665–75). Examination of the tax returns of Vitro Flex and Crinamex during verification showed no evidence of receipt of CEDIs, and Commerce's examination of the financial statements and the 1984 tax return of Vitro S.A. revealed no evidence of CEDI benefits. A.R. 47 at 20 (675). Furthermore, contrary to PPG's assertion, Commerce investigated FCE in its questionnaire and during verification. A.R. 24 at 8 (480); A.R. 47 at 20 (675). Responses to these inquiries, and an examination of FCE's financial statements failed to indicate receipt of CEDIs.

The Court concludes there is substantial evidence on the record to support Commerce's determination that the CEDI program of tax rebates was terminated in 1982, that Vitro Flex, Crinamex, Vitro S.A. and FCE did not receive CEDIs during the period of review, and that none of these parties received benefits from the alleged extra-CEDI program.

## CONCLUSION

On the basis of the foregoing, the Court remands this matter for further consideration consistent with this opinion on the issue of 1984 and 1985 FOMEX export loans. Commerce's final administrative review is affirmed in all other respects as based upon substantial evidence on the record and as otherwise in accordance with law. Commerce is directed to file the remand results with this Court within 60 days from the date of this determination.

---

**22.** The only connection appeared to be Vitro Flex's contractual use of the accounting services of an FCE employee for several months. *See* A.R. 47 at 20 (675).